**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| S & H PACKING & SALES CO., INC., a California corporation, DBA Season Produce Co., *Plaintiff*, | No. 14-56059 |
| and | D.C. No. 2:08-cv-05250-GW-FFM |
| G. W. PALMER & CO., INC.; ANDREW & WILLIAMSON SALES CO., INC., DBA Andrew & Williamson Fresh Produce; EAST COAST BROKERS AND PACKERS, INC.; GARGIULO, INC., *Plaintiffs-Appellants*, | |
| v. | |
| TANIMURA DISTRIBUTING, INC., a California corporation, *Defendant*, | |
| and | |
| AGRICAP FINANCIAL CORPORATION, a Delaware corporation, *Defendant-Appellee.* | |

S & H PACKING & SALES CO., INC., a California corporation, DBA Season Produce Co.,

*Plaintiff*,

and

APACHE PRODUCE CO., INC., an Arizona corporation, DBA Plain Jane; O.P. MURPHY PRODUCE CO., INC., a Texas corporation, DBA Murphy & Sons; OCEANSIDE PRODUCE, INC., a California corporation; WILSON PRODUCE, LLC, an Arizona Limited liability company; FRANK DONIO, INC.; ABBATE FAMILY FARMS LIMITED PARTNERSHIP; J.P.M. SALES CO., INC., an Arizona corporation,

*Plaintiffs-Appellants*,

THOMSON INTERNATIONAL, INC., assignee, Tanimura Distributing, Inc.,

*Creditor-Appellant*,

v.

TANIMURA DISTRIBUTING, INC.,

*Defendant*,

and

No. 14-56078

D.C. No.
2:08-cv-05250-
GW-FFM

OPINION

AGRICAP FINANCIAL CORPORATION,
a Delaware corporation,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of California
The Honorable George H. Wu, District Judge

Argued and Submitted on June 6, 2016
Pasadena, California

Filed February 27, 2017

Before: Ronald M. Gould, Michael J. Melloy,[*]
and Andrew D. Hurwitz, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Melloy

---

[*] The Honorable Michael J. Melloy, Senior Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

## SUMMARY[**]

### Perishable Agricultural Commodities Act

The panel affirmed the district court's summary judgment in favor of the defendant in an action brought by produce growers under the Perishable Agricultural Commodities Act.

The growers sold their perishable agricultural products on credit to a distributor, which made the distributor a trustee over a PACA trust holding the perishable products and any resulting proceeds for the growers as PACA-trust beneficiaries. The distributor sold the products on credit to third parties and, through a transaction described as a "factoring agreement," transferred its own resulting accounts receivable to defendant Agricap Financial Corp. The distributor's business later failed, and the growers did not receive payment in full from the distributor for their produce. The growers sued Agricap.

The panel affirmed the district court's holding that, pursuant to *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 128 (9th Cir. 2001), a commercially reasonable factoring agreement removes accounts receivable from the PACA trust without a trustee's breach of trust, thus defeating the growers' claims. The growers argued that a PACA trustee's true sale of trust assets, which does not breach trust duties, occurs when the trustee transfers not merely the right to collect the underlying accounts, but also the risk of non-payment on those accounts.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that *Boulder Fruit* implicitly rejected the transfer-of-risk test, and this implicit rejection was necessary to its holding. Accordingly, *Boulder Fruit* controlled the outcome of the growers' case.

Concurring, Judge Melloy, joined by Judge Gould, wrote that *Boulder Fruit* was wrongly decided and that the Ninth Circuit, sitting en banc, should eliminate a circuit split, speak expressly to this issue, and join the Second, Fourth, and Fifth Circuits by adopting a separate, threshold, transfer-of-risk test.

## COUNSEL

Louis W. Diess, III (argued) and Mary Jean Fassett, McCarron & Deiss, Washington, D.C., for Plaintiffs-Appellants G.W. Palmer & Co., Inc.; Gargiulo, Inc.; Andrew & Williamson Sales Co., Inc.; and East Coast Brokers & Packers, Inc.

Robert Porter Lewis (argued), Jr., Law Office of Robert P. Lewis Jr., South Pasadena, California, for Plaintiffs-Appellants Apache Produce Co., Inc; O.P. Murphy Produce Co., Inc.; Oceanside Produce, Inc.; Wilson Produce, LLC; Frank Donio, Inc.; Abbate Family Farms Limited Partnership; JPM Sales Co., Inc.; and Thomson International, Inc.

Cristoph Carl Heisenberg (argued), Hinckley & Heisenberg LLP, New York, New York, for Defendant-Appellee Agricap Financial Corporation.

**OPINION**

PER CURIAM:

Appellants are produce growers ("Growers") who sold their perishable agricultural products on credit to a distributor, Tanimura Distributing, Inc. ("Tanimura"). Pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499t, this arrangement made Tanimura a trustee over a PACA trust holding the perishable products and any resulting proceeds for the Growers as PACA-trust beneficiaries. Tanimura then sold the products on credit to third parties and transferred its own resulting accounts receivable to Appellee Agricap Financial ("Agricap") through a transaction Agricap describes as a "Factoring Agreement" or sale of accounts.[1] Although described as a sale of accounts, Agricap initially referred to the arrangement as a "credit facility," and the written agreement was entitled "Agricap Financial Corporation Factoring and Security Agreement." Further, the Factoring Agreement involved many hallmarks of a secured lending arrangement, including: security interests in accounts and all other asset classes except inventory; UCC financing statements; subordination of other debts; and substantial recourse for Agricap against Tanimura in the event Agricap was unable to collect from Tanimura's customers (for example, Agricap was entitled to force Tanimura to "repurchase" accounts that remained unpaid after 90 days,

---

[1] Factoring is "the commercial practice of converting receivables into cash by selling them at a discount." *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001) (citing *Black's Law Dictionary* (7th ed. 1999)).

and Agricap could enforce this right by withholding payments from Tanimura).

Tanimura's business later failed, and Growers did not receive payment in full from Tanimura for their produce. Growers sued Agricap alleging: (1) the Factoring Agreement was merely a secured lending arrangement structured to look like a sale but transferring no substantial risk of nonpayment on the accounts; (2) the accounts receivable and proceeds remained trust property under PACA; (3) because the accounts receivable remained trust property, Tanimura breached the PACA trust and Agricap was complicit in the breach; and (4) PACA-trust beneficiaries such as Growers held an interest superior to Agricap, and Agricap was liable to Growers.

Agricap moved for summary judgment arguing that, pursuant to *Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268 (9th Cir. 2001), a commercially reasonable factoring agreement removes accounts receivable from the PACA trust without a trustee's breach of trust, thus defeating the Growers's claims. Growers acknowledged that a PACA trustee generally may sell trust assets on commercially reasonable terms without breaching trust duties. Growers argued, however, that pursuant to *Nickey Gregory Co., LLC v. Agricap, LLC*, 597 F.3d 591, 598–99 (4th Cir. 2010), *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 414 (5th Cir. 2003), and *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067–69 (2d Cir. 1995), a court should not review the commercial reasonableness of a factoring agreement unless the court first determines a true

sale actually occurred.[2]   According to Growers, a true sale
occurs when a PACA trustee transfers not merely the right to
collect the underlying accounts, but also the risk of non-
payment on those accounts.[3]

Relying on *Boulder Fruit* and describing the cited cases
as a circuit split, the district court granted summary judgment.
The district court noted the Ninth Circuit in *Boulder Fruit*
expressly addressed the commercial reasonableness of a
factoring agreement but implicitly rejected a separate,
transfer-of-risk test.   Further, the court noted the factoring
agreement in *Boulder Fruit* transferred even less risk than the

---

[2] *See, e.g.*, *Reaves Brokerage*, 336 F.3d at 414 ("Characterization of
the agreement at issue turns on the substance of the relationship . . . , not
simply the label attached to the transaction. . . .  Application of the Second
Circuit's risk-transfer analysis and our own independent examination of
the substance of the parties' agreement leads us to conclude that the
relationship . . . was that of a secured lender and debtor, not a seller and
buyer." (internal citations and quotation marks omitted)).

[3] The Second Circuit described the transfer-of-risk test as follows:

> Where the lender has *purchased* the accounts
> receivable, the borrower's debt is extinguished and the
> lender's risk with regard to the performance of the
> accounts is direct, that is, the lender and not the
> borrower bears the risk of non-performance by the
> account debtor.  If the lender holds only a security
> interest, however, the lender's risk is derivative or
> secondary, that is, the borrower remains liable for the
> debt and bears the risk of non-payment by the account
> debtor, while the lender only bears the risk that the
> account debtor's non-payment will leave the borrower
> unable to satisfy the loan.

*Endico Potatoes*, 67 F.3d at 1069.

Factoring Agreement in the present case—in *Boulder Fruit*, the factoring agent enjoyed unrestricted discretion to force the distributor to repurchase accounts. The court therefore held that, even if *Boulder Fruit* could accommodate the transfer-of-risk test, the facts of *Boulder Fruit* controlled and precluded relief for Growers. Finally, the court concluded that the Factoring Agreement was commercially reasonable because Agricap paid to Tanimura 80% of the face value of the accounts as an up-front payment and ultimately paid to Tanimura an even greater percentage of the face value of the transferred accounts.

On appeal, Growers argue that we are not bound by *Boulder Fruit* because the absence of discussion of the transfer-of-risk test in *Boulder Fruit* leaves open the question of whether that test should apply in the Ninth Circuit. Agricap counters that *Boulder Fruit* settled the issue because the PACA-trust beneficiaries in *Boulder Fruit* asked the Court to apply the transfer-of-risk test; the parties in that case briefed the issue; the issue was squarely before the Court; yet, the Court did not apply the test.

Applying *de novo* review, *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 555 (9th Cir. 2016), we agree with the district court's conclusion that *Boulder Fruit* controls the outcome in the present case. *See United States v. Lucas*, 963 F.2d 243, 247 (9th Cir. 1992) (noting that subsequent panels are bound by prior panel decisions and only the *en banc* court may overrule panel precedent). In some cases, an earlier panel's election not to discuss an argument may prevent future panels from concluding the earlier panel implicitly accepted or rejected an argument. After all, "under the doctrine of *stare decisis* a case is important only for what it decides—for the 'what,' not for the 'why,' and not for the

'how.'"  *In re Osborne*, 76 F.3d 306, 309 (9th Cir. 1996) ("[T]he doctrine of *stare decisis* concerns the *holdings* of previous cases, not the rationales[.]").  In *Boulder Fruit*, however, implicit rejection of the transfer-of-risk test was *necessary* to the holding.  We reach this conclusion because the factoring agreement in *Boulder Fruit* involved virtually no transfer of risk from the distributor to the factoring agent.[4] Had the *Boulder Fruit* court not implicitly rejected the transfer-of-risk test, the holding of the case necessarily would have been different.

Further, because the Factoring Agreement in the present case transferred a small degree of risk of non-payment, at least when compared to the agreement at issue in *Boulder Fruit,* we agree that *Boulder Fruit* would preclude relief to the Growers even if it were possible for our panel to adopt the transfer-of-risk test.

Finally, Growers do not seriously contend on appeal that the Factoring Agreement was otherwise commercially unreasonable.  The Factoring Agreement in the present case is, in many material respects, similar to the agreement in *Boulder Fruit*.  And, Agricap paid to Tanimura under the current Factoring Agreement well in excess of what the Ninth Circuit previously described as a reasonable factoring rate. *Boulder Fruit*, 251 F.3d at 1272 ("In any case, a factoring

---

[4] The factoring agreement from *Boulder Fruit* is part of the current summary judgment record, and the briefs in that case are a matter of public record. *See, e.g.*, Brief of Appellants, *Boulder Fruit*, 251 F.3d 1268 (9th Cir. 2001) (No. 99-56770), 2000 WL 33989585.  To the extent such notice may be necessary, we take judicial notice of the *Boulder Fruit* parties' positions as set forth in their briefs.

discount of 20% was never shown to be commercially unreasonable.").

We therefore affirm the judgment of the district court.

**AFFIRMED.**

---

MELLOY, Circuit Judge, with whom GOULD, Circuit Judge, joins, concurring:

We concur.  We write further, however, because we believe *Boulder Fruit* was wrongly decided and the Ninth Circuit, sitting en banc, should eliminate this circuit split, speak expressly to this issue, and join the Second, Fourth, and Fifth Circuits by adopting a separate, threshold, transfer-of-risk test.

Congress intended PACA to prevent secured lenders from defeating the rights of PACA-trust beneficiaries.  The congressional focus upon the relative rights of these two groups is unmistakable.  As such, before assessing the commercial reasonableness of a factoring agreement, it is first necessary to examine the substance of a factoring agreement to ensure a true sale has occurred.  In the absence of a true sale, superficial indicators and labels surrounding a factoring agreement should be of no consequence.  The substance of the transaction matters.  If the substance of a transaction reveals a secured lending arrangement rather than a true sale, the accounts receivable remain trust assets.  Thus, unpaid trust beneficiaries hold an interest in accounts receivable and their proceeds superior to all unsecured and secured creditors such that the trust beneficiaries should prevail.

This conclusion enjoys further support in the simple fact that any attempt to assess the commercial reasonableness of a factoring agreement without carefully examining the substance of the rights transferred is an incomplete and abstract exercise. Whether a factoring discount of 10%, 20%, or more is reasonable in any given situation cannot be determined without first assessing what the factoring agent has contracted to do and what risk the factoring agent has accepted. Analyzing a factoring discount by looking exclusively at an initial payment without considering the availability of recourse and without assessing the nature of the rights and risks actually transferred from the distributor to the factoring agent examines only part of the transaction. Such an exercise is not grounded in reality and is akin to declaring a price to be reasonable without first identifying the product or service that carried that price.

We address below the structure and purpose of PACA, the circuit split regarding the transfer-of-risk test, and the application of that test to this case.

I.   The PACA Trust

"Congress enacted PACA in 1930 to prevent unfair business practices and promote financial responsibility in the fresh fruit and produce industry." *Boulder Fruit*, 251 F.3d at 1270. Congress amended PACA in 1984 "'to remedy [the] burden on commerce in perishable agricultural commodities and to protect the public interest' caused by accounts receivable financing arrangements that 'encumber or give lenders a security interest' in the perishable agricultural commodities superior to the growers." *Id.* (alteration in original) (quoting 7 U.S.C. § 499e(c)(1)). PACA attempts to remedy this burden through the creation of a statutory trust:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). "This provision imposes a 'non-segregated floating trust' on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust." *Endico Potatoes*, 67 F.3d at 1067 (citation omitted).

"[G]eneral trust principles [apply] to questions involving the PACA trust, unless those principles directly conflict with PACA." *Boulder Fruit*, 251 F.3d at 1271. And, because "[o]rdinary principles of trust law apply to trusts created under PACA, . . . the trust assets are excluded from the estate should the dealer [*i.e.*, the PACA trustee] go bankrupt." *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997).

Under general trust principles, a breach of trust occurs when there is "a violation by the trustee of any duty which as trustee he owes to the beneficiary." *Boulder Fruit*, 251 F.3d at 1271 (quoting Restatement (Second) of Trusts § 201

(1959)).  Federal regulations set forth a PACA trustee's primary duties, requiring the trustee "to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities."  *Id.* (quoting 7 C.F.R. § 46.46(d)(1)).  The duty to maintain trust assets is broad, such that "[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA]."  *Id.*  (second alteration in original) (quoting 7 C.F.R. § 46.46(d)(1)).

Because the non-segregated floating trust under PACA permits the commingling of trust assets and permits the PACA trustee to convert trust assets into proceeds, the transferees of trust assets, such as Agricap here, "are liable only if they had some role in causing [a] breach or dissipation of the trust."  *Boulder Fruit*, 251 F.3d at 1272; *see also* Restatement (Second) of Trusts § 283 (1959) ("If the trustee transfers trust property to a third person . . . [without] commit[ting] a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.").

Against this backdrop, the current parties and all circuit courts addressing the issue agree that a PACA trustee's true sale of accounts receivable for a commercially reasonable discount from the accounts' face value is not a dissipation of trust assets and, therefore, is not a breach of the PACA trustee's duties.  *See Nickey Gregory*, 597 F.3d at 598 ("The assets of the trust would thus have been converted into cash and the receivables would no longer have been trust assets. Obviously, under this scenario, [the factoring agent] would own the accounts receivable and would be able to do with them what it wished."); *Reaves Brokerage*, 336 F.3d at

413–14; *Boulder Fruit*, 251 F.3d at 1271–72; *Endico Potatoes*, 67 F.3d at 1067–68. Such a sale is merely a conversion of trust assets from accounts receivable into cash. These circuits also agree that any purported security interest for a lender in PACA-trust assets is inferior to the trust beneficiaries' claims and rights. *See, e.g.*, *Nickey Gregory*, 597 F.3d at 598–99 ("Thus, if the accounts receivable were held . . . as collateral to secure repayment of a loan, they would also have been held for the benefit of produce sellers, and the produce sellers would have effectively enjoyed a first-creditor position in them."); *Endico Potatoes*, 67 F.3d at 1069 ("Because [the factoring agent] held only a security interest . . . its interest is subject to the rights of the PACA trust beneficiaries. . . . [The factoring agent] must . . . disgorge amounts collected on the accounts after [the distributor's] bankruptcy filing to the extent necessary to satisfy claims of PACA trust beneficiaries."). In fact, in *Boulder Fruit*, notwithstanding the absence of discussion of a "true-sale" or "transfer-of-risk" test, the Ninth Circuit provided an illustration making clear that use of PACA-trust assets as collateral to secure a debt could not create a priority security interest for a lender greater than the position enjoyed by PACA trust beneficiaries:

> Farmer sells oranges on credit to Broker. Broker turns around and sells the oranges on credit to Supermarket, generating an account receivable from Supermarket. Broker then obtains a loan from Bank and grants Bank a security interest in the account receivable to secure the loan. Broker goes bankrupt. Under PACA, Broker is required to hold the receivable in trust for Farmer until Farmer was paid in full; use of the receivable as

collateral was a breach of the trust.  Therefore, Farmer's rights in the Supermarket receivable are superior to Bank's.  In fact, as a trust asset, the Supermarket receivable is not even part of the bankruptcy estate.

*Boulder Fruit*, 251 F.3d at 1271.

## II.  Transfer-of-Risk Test for Identifying True Sales

The treatment of true sales and security interests, therefore, is clear.  What remains unclear is the analysis to apply when the true nature of the transaction is ambiguous. How should a court treat a transaction if the parties to a factoring agreement label the transaction a sale of accounts but provide substantial recourse for the factoring agent, such as requiring the distributor to "repurchase" non-performing accounts or permitting the factoring agent to withhold payments or otherwise recoup payments already made to the distributor?   What if, such labels notwithstanding, the recourse and security provided include a security interest in the accounts receivable?  Has a true sale actually occurred?

Growers and the Second, Fourth, and Fifth Circuits apply a threshold transfer-of-risk test to determine if such a transaction is a true sale or a mere secured lending relationship. Agricap, relying on *Boulder Fruit*, argues the court need only ask if the transaction was commercially reasonable.

In *Boulder Fruit*, the Ninth Circuit held factoring agreements do not *per se* breach the PACA trust because, consistent with general trust principles, "a trustee can sell trust assets *unless* the sale breaches the trust."  251 F.3d at

1272. The court concluded "a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA and 7 C.F.R. § 46.46(d)(1)—to maintain trust assets so that they are freely available to satisfy outstanding obligations to sellers of perishable commodities." *Id.* at 1271 (internal quotation marks omitted). The court indicated that whether a factoring agreement is commercially reasonable depends upon the terms of the agreement. For example, "[a] PACA trustee who sells accounts for pennies on the dollar, just to turn a quick buck, might well have breached the PACA trust, while a trustee who factors accounts at a commercially reasonable rate would not." *Id.*

In reaching its conclusion, the *Boulder Fruit* panel stated the factoring agreement "actually enhanced the trust" for three reasons. *Id.* at 1272. First, it allowed the distributor to quickly convert accounts receivable to cash.[1] *Id.* Second, in the course of performance, the distributor "actually received . . . more for the accounts than the accounts would prove to be worth." *Id.* And third, "a factoring discount of 20% was never shown to be commercially unreasonable." *Id.* The Ninth Circuit therefore considered not only the up-front payment from factoring agent to distributor but also the actual sums paid to the distributor by the factoring agent during the

---

[1] Further, because the price of such commodities tend to rise as the commodities move through the distribution chain from grower to final customer, sales of an intermediate distributor's accounts receivable, even at a commercially reasonable discount to face value, reasonably might be expected to result in adequate funds for the PACA trustee to pay the produce growers.

course of performance of the factoring agreement.[2]   The Ninth Circuit did not, however, examine the substance of the rights transferred to determine what the factoring agent agreed to do, what risk the factoring agent accepted when it accepted the right to collect on the transferred accounts, and whether the transaction properly should be deemed a sale rather than a mere secured lending arrangement.  Rather, the Ninth Circuit in *Boulder Fruit* merely characterized the transaction as a sale or factoring agreement without discussing the factoring agent's rights and ability to seek recourse against the distributor.

In contrast, the Fourth, Fifth, and Second Circuits considered it necessary to examine the rights and risks transferred between the parties to a factoring agreement.  *See Nickey Gregory*, 597 F.3d at 600–03; *Reaves Brokerage*, 336 F.3d at 414–16; *Endico Potatoes*, 67 F.3d at 1068–69. As the Fourth Circuit stated, "[I]f the accounts receivable were not *sold* but rather were given as *collateral* for a loan, then the accounts receivable would have remained trust assets, subject to [the factoring agent's] security interest." *Nickey Gregory*, 597 F.3d at 598 (emphasis in original). Whether the accounts receivable remained accounts or were converted into cash, however, the factoring agent's "position with respect to that cash would have been subordinate to the claims of produce sellers while they remained unpaid."  *Id.* In contrast, "[i]f [the distributor] had transferred these trust

---

[2] The 20% discount at issue in *Boulder Fruit* as referenced above represented a discount from the accounts' face value as paid in an initial payment from the factoring agent to the PACA trustee.  It did not represent the final amount paid nor did it represent a floor or a ceiling on what the factoring agreement in *Boulder Fruit* could have caused the factoring agent ultimately to pay.  The detailed terms of the factoring agreement in *Boulder Fruit* are addressed below.

assets . . . by means *of a sale* in exchange for cash, the transaction would have been nothing more than a permissible conversion of trust assets from one form to another—*i.e.,* from accounts receivable into cash." *Id.* at 599. If such a true sale had occurred, "the accounts receivable would no longer have remained trust assets, and the commodities sellers would not have had any claim for payment from them." *Id.* at 599–600.

*Nickey Gregory*, 597 F.3d at 594, and *Reaves Brokerage*, 336 F.3d at 412, involved factual patterns similar to the present case. *Endico Potatoes* involved a similar question: whether a "purchaser" of accounts was a bona fide purchaser for true value or merely a lender. 67 F.3d at 1065–66. In these cases, the courts examined the text and legislative history of PACA, as well as the regulations promulgated under PACA, to conclude Congress intended to elevate the interests of produce growers above the interests of secured lenders. *See, e.g.*, *Nickey Gregory*, 597 F.3d at 594–95, 598–99; *Endico Potatoes*, 67 F.3d at 1066–68. The Fourth Circuit noted in particular that representatives of the secured lending community had expressed concern over PACA's likely effect upon secured lenders and the factoring industry. *Nickey Gregory*, 597 F.3d at 599. The court concluded that Congress nevertheless found the balance of policy interests to favor placing those lenders in a position subordinate to unpaid growers. *Id.*

For example, the House Report explaining the 1984 PACA amendments states:

> [Purchasers/Distributors of perishable agricultural commodities] in the normal course of their business transactions, operate

> on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency.  Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by contract.

H.R. Rep. No. 98-543, at 3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 405, 407.  The Second Circuit, citing this report, explained:

> According to Congress, due to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify.  Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables.

*Endico Potatoes*, 67 F.3d at 1067.  Given this focus, it becomes evident that this circuit's focus, too, should be upon the true nature of the transactions at issue and the true nature of the parties' roles, *i.e.*, that of seller and buyer or that of secured lender and borrower.

Importantly, Congress not only knew it was elevating the interests of growers above the interests of secured lenders, Congress expressly found the secured lenders' practices had been resulting in a "burden on commerce," H.R. Rep. No. 98-543, at 4, and further found the creation of statutory trust would aid commerce. As recognized in *Nickey Gregory*, the American Bankers Association had testified to Congress that creation of the PACA trust would create "difficult[ies for] lenders . . . in administering their secured loans." 597 F.3d at 599. Congress nevertheless "made th[e] policy choice to make the unsecured credit extended by commodities sellers superior to the position of lenders holding a security interest in those commodities and proceeds." *Id.* The House Report stated:

> The Committee believes that the statutory trust requirements will not be a burden to the lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry. Prompt payments should generate trade confidence and new business which yields increased cash and receivables, the prime security factors to the money lender.

H.R. Rep. No. 98-543, at 4.

Given the remedy Congress created to address the perceived problem (creation of the trust elevating

commodities sellers' interests over lenders' interests), given Congress's clear concern with the relative interests of secured lenders and commodities sellers, and given the general backdrop of trust law (in particular, a trustee's ability to sell or convert trust assets), courts must focus on the true substance of PACA-related transactions and not on superficial indicators or labels. Simply put, it runs counter to PACA and its history to permit the simple use of the words "sale" or "purchase" or "factoring agreement" to control for purposes of assessing the relative rights of lenders and produce growers.

III.     Transfer of Primary or Direct Risk as the Hallmark of a True Sale

The Second, Fourth, and Fifth Circuits conclude a transfer of the primary or direct risk of non-payment on the accounts stands as the hallmark of a true sale. *Nickey Gregory*, 597 F.3d at 601–03; *Reaves Brokerage*, 336 F.3d at 417; *Endico Potatoes*, 67 F.3d at 1068–69. In addition, these courts (as well as the regulations under PACA) focus upon trust asset encumbrance and dissipation in relation to what the terms of a factoring agreement *could* permit rather than how the parties actually performed under a factoring agreement. *See, e.g.*, 7 C.F.R. § 46.46(a)(2) ("'Dissipation' means any act or failure to act which *could* result in the diversion of trust assets or which *could* prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." (emphasis added)). This focus is important because, although a factoring agent might pay to a distributor/PACA trustee sums adequate for the trustee to pay the beneficiaries, and although those amounts might represent a commercially reasonable discount from the accounts' face values, the payment of such amounts

should be immaterial if (1) the trustee does not pay the beneficiaries in full; and (2) the accounts receivable and their proceeds remain trust assets.

In assessing whether a true sale occurred, the Fourth Circuit adopted the transfer-of-risk test as set forth and explained by the Second Circuit in *Endico Potatoes*. *Nickey Gregory*, 597 F.3d at 600–03. There, the Second Circuit distinguished between direct risk, on the one hand, and secondary or derivative risk, on the other. *Endico Potatoes*, 67 F.3d at 1068–69. The Second Circuit stated it was appropriate to examine several factors such as "[1] the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt." *Endico Potatoes*, 67 F.3d at 1068. The court concluded, "The root of all of these factors is the transfer of risk." *Id.* at 1069. Finally, the court summarized:

> Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while

> the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Id.*

We conclude this transfer-of-risk test must apply to avoid reliance on self-serving labels inserted into factoring agreements to defeat clear congressional intent. We also conclude it follows quite naturally that it is not even possible to assess the commercial reasonableness of a factoring agreement without first understanding the true nature of the transferred risks and transferred rights. A factoring agent who accepts risk of non-payment on the transferred accounts is the owner of the accounts, for better or worse. *See Nickey Gregory*, 597 F.3d at 601 ("The purchaser assumes the risk of collection, betting that its success in collecting on the accounts receivable will yield a return exceeding the discounted price it paid for the asset."); *id.* at 598 ("Obviously, under this scenario, [the factoring agent] would own the accounts receivable and would be able to do with them what it wished."). That risk will be reflected in the price. A factoring agent who functionally serves only as a lender and collection firm, however, accepts accounts for collection but enjoys the right to force the distributor to repurchase non-performing accounts. Such a factoring agent faces much less risk—risk measured only by the limitations on the repurchase provisions and by the distributor's solvency and ability to perform under the agreement. Common sense dictates that the price paid for the accounts with and without recourse will differ. Common sense also dictates that commercial reasonableness cannot be assessed without first examining the substance of the transaction.

Agricap nevertheless argues adoption of the transfer-of-risk test would lead to absurd results in which a factoring agent remains liable to growers even though the factoring agent's payments to a distributor were sufficient, in theory, for the distributor to pay growers. Agricap overstates its case in characterizing such a scenario as absurd. It is merely the result of a clear policy choice set forth by Congress. In fact, such a result is not even uncommon.

To see an everyday example where a similar scenario plays out, it is only necessary to look to the relationship between general contractors, subcontractors, and property owners in the context of mechanics' liens. It is well established beyond the need for citations that a property owner who makes final payment to a general contractor without first securing a release of subcontractors' mechanics' liens holds the property subject to those liens and faces direct exposure to the subcontractors' claims. This is true regardless of whether the amount the property owner paid to the general contractor was sufficient to pay the subcontractors. If the subcontractors are not paid, their interests prevail over the property owner (who may seek recourse against the general contractor, but who still faces direct liability to the subcontractors). State legislatures made the policy choice to put the interests of subcontractors ahead of those of property owners. Property owners, of course, may guard against this risk by performing due diligence and ensuring subcontractors' liens are released before making final payment to a general contractor.

Similarly, by putting the burden of due diligence on lenders rather than growers, Congress was well aware of the effect it was imposing on the lending industry. Congress concluded, however, that lenders could adapt. The House

Committee expressly noted that anticipated improvements to commerce would offset the lenders' anticipated burdens. H.R. Rep. No. 98-543, at 4 ("[T]he statutory trust requirements . . . will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry.").

The propriety of comparing the PACA situation to mechanics' liens is shown by examining the longstanding regulations promulgated under PACA. These regulations do not ask whether a factoring arrangement in fact resulted in a transfer of funds sufficient to pay growers throughout the course of performance under a factoring agreement. Rather, the regulations ask whether such an arrangement "could" impair trust assets. 7 C.F.R. § 46.46(a)(2). Just as a property owner must conduct due diligence to avoid liability to a subcontractor before making final payment to a general, a factoring agent with knowledge of PACA must act with diligence. It does not matter that a factoring agent paid a distributor sufficient funds to pay growers any more than it matters that a property owner paid a general contractor sufficient funds to pay subcontractors. In light of these protections, it cannot be the case that a distributor and factoring agent may defeat trust beneficiaries' rights merely by invoking the labels "sale" or "factoring agreement."

IV.     Transfer of Risk in the Factoring Agreement and in *Boulder Fruit*

Turning to the actual factoring agreements in the present case and in *Boulder Fruit*, it is helpful to describe the

relationship between Tanimura and Agricap and how the parties came to enter into the Factoring Agreement.

In late 2007, Tanimura found itself facing cash flow difficulties and reached out to Agricap in an effort to "improve [Tanimura's] working capital situation and [Tanimura's] ability to pay vendors." In December 2007, Tanimura completed an application for a "factoring line" from Agricap. In response, Agricap asked for a fee to conduct due diligence and referenced the possibility of "entering into certain arrangements to provide a factoring facility." In a "term sheet" attached to this response, Agricap referred to itself as the "lender," referred to Tanimura as the "seller," and referred to the "factoring facility" as a "credit facility." It also stated Agricap would provide to Tanimura "collection services." From inception, then, it seems clear Agricap viewed itself as a lender providing collection services to Tanimura rather than a true purchaser of accounts collecting for itself on the accounts it would truly own. Nevertheless, Agricap also indicated "Seller would sell to Agricap, and Agricap would purchase from Seller, all of Seller's accounts receivable." Agricap then investigated Tanimura's finances and completed a "Client Credit Approval Form" dated January 8, 2008.

On February 4, 2008, Tanimura and Agricap entered into the "Agricap Financial Corporation Factoring and Security Agreement." The Factoring Agreement provided that Agricap would "purchase" Tanimura's accounts receivable for 80% of the face value and would hold the remaining 20% in a reserve account. Agricap would then collect on the accounts from Tanimura's customers, pay itself a financing fee as a percentage of the face value of the accounts, and also pay itself an interest fee based upon the length of time the

accounts had remained outstanding.  After retaining its fees and maintaining a reserve account, Agricap would pay to Tanimura the balance of the collected amounts.

The Factoring Agreement, however, transferred to Agricap very little in the way of primary or direct risk of non-payment.  The Factoring Agreement granted Agricap the unilateral ability to increase the reserve account (*i.e.*, withhold payments to Tanimura of funds collected from accounts) by "such additional reserves as are deemed necessary and appropriate in [Agricap's] sole discretion."  It also granted Agricap the ability to force Tanimura to purchase back certain accounts based upon the occurrence of certain events.  For example, if a dispute arose between Tanimura and a customer, Agricap could force Tanimura to repurchase the customer's account.

Importantly, Tanimura agreed to repurchase *any* accounts that remained uncollected after 90 days.  And, in the event of Tanimura's insolvency, the repurchase amount could be deducted from the reserve account.  Agricap's only practical risk, therefore, was possible insolvency by Tanimura at a time when the reserve account was insufficient to fund the unpaid accounts.  In other words, assuming Tanimura's continued solvency, Agricap could obtain full recourse against Tanimura for 90-day-old unpaid accounts, and Agricap's risk of non-payment by Tanimura's customers was cabined to 90-day windows (during which Agricap received a financing fee and interest).

The parties also executed ancillary documents when entering into the Factoring Agreement.  Tanimura's principal executed a personal guarantee. Agricap took a priority interest in all of Tanimura's assets other than inventory, filing

a UCC financing statement to this effect. Also, Tanimura itself and Tanimura's other primary lender agreed to subordinate their debt to Agricap.

The parties disagree as to the actual amounts of money that changed hands between Tanimura and Agricap, but it appears undisputed that the transferred accounts exceeded $20 million and Agricap ultimately paid to Tanimura an amount in excess of 90% of the face value of those accounts.

The factoring agreement at issue in *Boulder Fruit* was substantially similar to the Factoring Agreement in the present case. The factoring agent in *Boulder Fruit*, however, was not subject to the same express limitations on the timing or reasons for forcing the PACA trustee to repurchase accounts. Rather, the factoring agreement in *Boulder Fruit* permitted the factoring agent to force the PACA trustee to repurchase any account the factoring agent determined, "in its sole and absolute discretion . . . is or may not be fully collectible."

Reviewing these provisions, we conclude that neither the present Factoring Agreement nor the agreement in *Boulder Fruit* transferred primary or direct risk of non-payment to the factoring agents. In the absence of controlling precedent, therefore, we would hold neither agreement effected a true sale of trust assets. Rather, both were mere secured financing arrangements, as further indicated by Agricap's descriptions of itself as "lender" and the Factoring Agreement as a "credit facility."

In summary, Congress created a system to protect growers of fruits, vegetables, and other perishable commodities. The growers in this Circuit have effectively

lost that protection due to lenders merely labeling true security agreements as factoring agreements. This is not an isolated issue in a cottage industry. Perishable agricultural commodities are a multi-billion dollar enterprise in this Circuit as well as nationwide. We would encourage an *en banc* court to consider bringing the Ninth Circuit into line with the other circuits that have considered this issue.