**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

S & H PACKING & SALES CO., INC.,
DBA Season Produce Co., a
California corporation,
*Plaintiff*,

and

G. W. PALMER & CO., INC.; ANDREW
& WILLIAMSON SALES CO., INC.,
DBA Andrew & Williamson Fresh
Produce; EAST COAST BROKERS AND
PACKERS, INC.; GARGIULO, INC.,
*Plaintiffs-Appellants*,

v.

TANIMURA DISTRIBUTING, INC., a
California corporation,
*Defendant*,

and

AGRICAP FINANCIAL CORPORATION,
a Delaware corporation,
*Defendant-Appellee.*

No. 14-56059

D.C. No.
2:08-cv-05250-
GW-FFM

| | |
|---|---|
| S & H PACKING & SALES CO., INC., DBA Season Produce Co., a California corporation, *Plaintiff*, | No. 14-56078 <br><br> D.C. No. 2:08-cv-05250-GW-FFM |
| and | |
| APACHE PRODUCE CO., INC., DBA Plain Jane, an Arizona corporation; O.P.MURPHY PRODUCE CO., INC., DBA Murphy & Sons, a Texas corporation; OCEANSIDE PRODUCE, INC., a California corporation; WILSON PRODUCE, LLC, an Arizona Limited liability company; FRANK DONIO, INC.; ABBATE FAMILY FARMS LIMITED PARTNERSHIP; J.P.M. SALES CO., INC., an Arizona corporation, *Plaintiffs-Appellants*, | OPINION |
| THOMSON INTERNATIONAL, INC., assignee, Tanimura Distributing, Inc., *Creditor-Appellant*, | |
| v. | |
| TANIMURA DISTRIBUTING, INC., *Defendant*, | |
| and | |

AGRICAP FINANCIAL CORPORATION,
a Delaware corporation,
                              *Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted En Banc September 20, 2017
San Francisco, California

Filed February 22, 2018

Before:  Sidney R. Thomas, Stephen Reinhardt, M.
Margaret McKeown, Kim McLane Wardlaw, William A.
Fletcher[*], Ronald M. Gould, Consuelo M. Callahan, Sandra
S. Ikuta, Jacqueline H. Nguyen, Andrew D. Hurwitz and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Gould;
Dissent by Judge Ikuta

---

[*] This case was submitted to a panel that included Judge Kozinski,
who recently retired.  Following Judge Kozinski's retirement, Judge W.
Fletcher was drawn by lot to replace him.  Ninth Circuit General Order
3.2.h.  Judge W. Fletcher has read the briefs and reviewed the record.

## SUMMARY[**]

### Perishable Agricultural Commodities Act

The en banc court vacated the district court's summary judgment in favor of defendant AgriCap Financial Corp. in an action brought by produce growers under the Perishable Agricultural Commodities Act, and remanded for further proceedings.

The growers sold their perishable agricultural products on credit to Tanimura Distributing, Inc., a distributor, which made Tanimura a trustee over a PACA trust holding the perishable products and any resulting proceeds for the growers as PACA-trust beneficiaries. Tanimura sold the products on credit to third parties and transferred the resulting accounts receivable to AgriCap through a transaction AgriCap described as a "Factoring Agreement" or sale of accounts. Tanimura's business later failed, and the growers did not receive payment in full from Tanimura for their products.

The growers sued AgriCap, alleging: (1) that the Factoring Agreement was merely a secured lending arrangement structured to look like a sale; (2) that the accounts receivable and proceeds, therefore, remained trust property under PACA; (3) that because the accounts receivable remained trust property, Tanimura breached the PACA trust and AgriCap was complicit in the breach; and (4) that under PACA the PACA-trust beneficiaries,

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

including the growers, held an interest superior to that of any secured lender.  Hence, AgriCap was liable to the growers to repay the value of the accounts receivable.

Joining other circuits, the en banc court adopted a threshold "true sale" test to determine whether assets transferred in transactions that are labeled "sales" remain assets of a PACA trust.  The en banc court held that a court must conduct a two-step inquiry when determining whether the questioned transaction is a sale or creates a security interest, i.e., a loan.  First, a court must apply a threshold true sale test of which the transfer-of-risk is a key, but not the sole, factor.  If a court concludes that there was a true sale, it must then determine if the transaction was commercially reasonable.  To the extent that its opinion contradicted *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268 (9th Cir. 2001), the en banc court overruled *Boulder Fruit*.

On remand, the district court should determine whether the transaction at issue was a true sale or a lending agreement.

Dissenting, Judge Ikuta, joined by Judges Hurwitz and Friedland, wrote that the majority's conclusion—that if a PACA trustee borrows money from a lender in order to pay the growers, but the money runs out before all the growers are paid, then the lender has an obligation to make the unpaid growers whole—is unmoored from both the text of PACA and settled principles of trust law.

**COUNSEL**

Louis W. Diess III (argued) and Mary Jean Fassett, McCarron & Diess, Washington, D.C., for Plaintiffs-Appellants G.W. Palmer & Co., Inc.; Gargiulo, Inc.; Andrew & Williamson Sales Co., Inc.; and East Coast Brokers & Packers, Inc.

Robert Porter Lewis, Jr., Law Office of Robert P. Lewis Jr., South Pasadena, California; Bradley L. Cornell, Cornell Law Firm, Pasadena, California, for Plaintiffs-Appellants Apache Produce Co., Inc; O.P. Murphy Produce Co., Inc.; Oceanside Produce, Inc.; Wilson Produce, LLC; Frank Donio, Inc.; Abbate Family Farms Limited Partnership; JPM Sales Co., Inc.; and Thomson International, Inc.

Cristoph Carl Heisenberg (argued), Hinckley & Heisenberg LLP, New York, New York, for Defendant-Appellee AgriCap Financial Corporation.

# OPINION

GOULD, Circuit Judge:

Appellant produce growers ("Growers")[1] sold their perishable agricultural products on credit to a distributor, Tanimura Distributing, Inc. ("Tanimura"). Under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499s, this arrangement made Tanimura a trustee over a PACA trust holding the perishable products and any resulting proceeds for Growers as PACA-trust beneficiaries. Tanimura sold the agricultural products on credit to third parties. It then transferred the resulting accounts receivable to Appellee AgriCap Financial ("AgriCap") through a transaction AgriCap describes as a "Factoring Agreement" or sale of accounts.[2]

Although described as a sale of accounts, the Factoring Agreement involved some hallmarks of a secured lending arrangement: AgriCap referred to itself as "Lender," and the written agreement was entitled "AgriCap Financial Corporation Factoring and Security Agreement." Further, AgriCap was granted security interests in accounts receivable and all other asset classes except inventory; UCC financing statements were filed; other debts were subordinated; and there was a measure of recourse for

---

[1] Growers are tomato suppliers whose various lawsuits against Tanimura Distributing, Inc. were consolidated into one case before the district court.

[2] Factoring is "the commercial practice of converting receivables into cash by selling them at a discount." *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001) (citing *Black's Law Dictionary* (7th ed. 1999)).

AgriCap against Tanimura if AgriCap could not collect from Tanimura's customers—for example, AgriCap was entitled to force Tanimura to "repurchase" accounts that remained unpaid after 90 days, and AgriCap could enforce this right by withholding payments from Tanimura.

The central dispute in this case developed after Tanimura's business failed, and Growers did not receive full payment from Tanimura for their produce.[3]  Growers sued AgriCap alleging: (1) that the Factoring Agreement was merely a secured lending arrangement structured to look like a sale; (2) that the accounts receivable and proceeds, therefore, remained trust property under PACA; (3) that because the accounts receivable remained trust property, Tanimura breached the PACA trust and AgriCap was complicit in the breach; and (4) that under PACA the PACA-trust beneficiaries, including Growers, held an interest superior to that of any secured lender.  Hence, AgriCap was liable to Growers to repay the value of the accounts receivable.

AgriCap moved for summary judgment arguing that, under *Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268 (9th Cir. 2001), a trustee is allowed to remove assets from the trust in any commercially reasonable way without breaching the trust.  And, it argued, the factoring agreement was commercially reasonable, like the one upheld in *Boulder Fruit*.  Growers acknowledged that a PACA trustee generally may sell PACA-trust assets on commercially reasonable terms without breaching trust duties.  They

---

[3] Tanimura owed Growers more than $800,000 when Tanimura ceased operation.

argued, however, that under precedents from the Second, Fourth and Fifth Circuits,[4] a court should not review the commercial reasonableness of a factoring agreement unless and until the court first determines that a true sale actually occurred.[5] According to Growers, a true sale only occurs when a PACA trustee transfers not only the right to collect the underlying accounts, but also the risk of non-payment on those accounts.[6]

---

[4] *See Nickey Gregory Co. v. Agricap, LLC*, 597 F.3d 591, 598 (4th Cir. 2010); *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 414 (5th Cir. 2003); and *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067–69 (2d Cir. 1995).

[5] *See, e.g.*, *Reaves Brokerage*, 336 F.3d at 414 (holding that the "[c]haracterization of the agreement at issue turns on the substance of the relationship" and "not simply the label attached to the transaction," and concluding that the relationship "was that of a secured lender and debtor, not a seller and buyer" (internal quotation marks and citations omitted)).

[6] The Second Circuit described the transfer-of-risk test as follows:

> Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Endico Potatoes*, 67 F.3d at 1069.

The district court described the cited cases as a circuit split and granted summary judgment in favor of AgriCap relying on *Boulder Fruit*. The district court reasoned that the Ninth Circuit in *Boulder Fruit* expressly addressed the commercial reasonableness of a factoring agreement but implicitly rejected a separate, transfer-of-risk test. The district court further reasoned that the factoring agreement in *Boulder Fruit* transferred even less risk than did the Factoring Agreement here—in *Boulder Fruit*, the factoring agent enjoyed unrestricted discretion to force the distributor to repurchase accounts. The district court concluded that, even if *Boulder Fruit* could accommodate the transfer-of-risk test, the facts of *Boulder Fruit* controlled and precluded relief for Growers. The district court finally concluded that the Factoring Agreement was commercially reasonable because AgriCap paid Tanimura 80% of the face value of the accounts, an amount that has never been found to be unreasonable, as an up-front payment and AgriCap ultimately paid Tanimura an even greater percentage of the face value of the transferred accounts.

On appeal, Growers argued to the three-judge panel that we are not bound by *Boulder Fruit* because *Boulder Fruit* did not discuss the transfer-of-risk test, leaving open the question of whether that test should apply in the Ninth Circuit. AgriCap countered by contrast with its argument that *Boulder Fruit* settled the issue because the PACA-trust beneficiaries in *Boulder Fruit* asked the Court to apply the transfer-of-risk test; the parties in that case briefed the issue; the issue was squarely before the Court; and yet, the Court did not apply the test.

The three-judge panel agreed with the district court's conclusion that *Boulder Fruit* controlled the outcome in this case. *S & H Packing & Sales Co., Inc. v. Tanimura Distrib.,*

*Inc.*, 850 F.3d 446, 450–51 (9th Cir.)*, reh'g en banc granted,* 868 F.3d 1047 (9th Cir. 2017); *see Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 555 (9th Cir. 2016); *see also United States v. Lucas*, 963 F.2d 243, 247 (9th Cir. 1992) (noting that subsequent panels are bound by prior panel decisions and only the *en banc* court may overrule panel precedent).   The three-judge panel reasoned that had the *Boulder Fruit* court not implicitly rejected the transfer-of-risk test, the holding of the case necessarily would have been different.  Judge Melloy wrote a separate concurring opinion suggesting that the Ninth Circuit, sitting en banc, should eliminate a circuit split and expressly adopt a separate threshold transfer-of-risk test joining several other circuits. *S & H Packing & Sales Co.*, 850 F.3d at 451 (Melloy, J., concurring).[7]  A majority of the active judges on this Court agreed to rehear this appeal *en banc*.

# I

We have jurisdiction under 28 U.S.C. § 1291.  *Boulder Fruit*, 251 F.3d at 1270.  "We review grants of summary judgment de novo."  *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1050 (9th Cir. 1999).  We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court applied the substantive law correctly.  *Id.*

# II

Although the parties ask us to answer many particularized questions on appeal, we resolve only one issue: whether, in the context of determining the assets

---

[7] This opinion is in substantial agreement with arguments made in Judge Melloy's concurrence and draws heavily therefrom.

included in a PACA trust, a court needs to conduct a threshold true sale inquiry before it determines whether a transaction transferring PACA trust assets was a commercially reasonable sale.  For the reasons stated below, we join the Second, Fourth and Fifth Circuits in adopting a threshold true sale test to determine whether assets transferred in transactions that are labeled "sales" remain assets of a PACA trust.  We hold that a court must conduct a two-step inquiry when determining whether the questioned transaction is a sale or creates a security interest, i.e., a loan.  First, a court must apply a threshold true sale test of which the transfer-of-risk is a key, but not the sole, factor.  If a court concludes that there was a true sale, it must then determine if the transaction was commercially reasonable.  If there was not a true sale, the court's inquiry stops there and the assets remain in the trust.  If there was a true sale but the sale was not commercially reasonable, there is a breach of the trust and the assets likewise remain in the trust.  If, however, the court concludes that there was a true sale and that the transaction was commercially reasonable, the buyer owns the assets free and clear of the trust.  We hold that a district court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan.  In doing so, the transfer of risk should be a primary factor to which a court looks.

## III

We elaborate on the principles just summarized, with reference to pertinent authorities and reasoning.

## A

"Congress enacted PACA in 1930 to prevent unfair business practices and promote financial responsibility in the fresh fruit and produce industry."  *Boulder Fruit*, 251 F.3d

at 1270. Congress amended PACA in 1984 "'to remedy [the] burden on commerce in perishable agricultural commodities and to protect the public interest' caused by accounts receivable financing arrangements that 'encumber or give lenders a security interest' in the perishable agricultural commodities superior to the growers." *Id.* (alteration in original) (quoting 7 U.S.C. § 499e(c)(1)). PACA creates a statutory trust in an effort to remedy this burden:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). "This provision imposes a 'non-segregated floating trust' on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust." *Endico Potatoes*, 67 F.3d at 1067 (citation omitted).

The House Report explaining the 1984 PACA amendments states:

> [Purchasers/Distributors of perishable agricultural commodities] in the normal

course of their business transactions, operate on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by contract.

H.R. Rep. No. 98-543 at *3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 405, 407. The Second Circuit, citing this report, explained:

According to Congress, due to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify. Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables.

*Endico Potatoes*, 67 F.3d at 1067. Given this history, it is evident that our focus should be upon the true nature of the transactions at issue and the true nature of the parties' roles—that of seller and buyer or that of secured lender and borrower.

Perhaps most importantly, Congress intended to shield agricultural growers from risk in enacting PACA "to protect the public interest." 7 U.S.C. § 499e(c)(1). PACA's purpose is not to give a one-sided boon to growers, but instead, to benefit all parties and society by ensuring that growers are protected; lenders know their risk; and agricultural commerce is encouraged to benefit society.

## B

We apply general trust principles to questions involving PACA trusts, unless those principles directly conflict with PACA. *Boulder Fruit*, 251 F.3d at 1271; *see also Endico Potatoes*, 67 F.3d at 1067; *Reaves*, 336 F.3d at 413. Because ordinary principles of trust law apply to trusts created under PACA, trust assets are excluded from the bankruptcy estate if the PACA trustee goes bankrupt. *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997).

A breach of trust occurs when there is "a violation by the trustee of any duty which as trustee he owes to the beneficiary." *Boulder Fruit*, 251 F.3d at 1271 (quoting Restatement (Second) of Trusts § 201 (1959)). A trustee is required by federal regulation "to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." *Id.* (quoting 7 C.F.R. § 46.46(d)(1)). The duty to maintain trust assets is far-reaching. Federal regulation dictates that "[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA]." *Id.* (second alteration in original) (quoting 7 C.F.R. § 46.46(d)(1)). Non-segregated floating trusts under PACA permit the commingling of trust assets and allow the PACA trustee to convert trust assets into proceeds. *Boulder Fruit*, 251 F.3d at 1272; *see also Endico Potatoes*, 67 F.3d at 1067;

*A&J Produce Corp. v. Bronx Overall Econ. Dev. Corp.*, 542 F.3d 54, 57–58 (2d Cir. 2008). The transferees of trust assets, such as AgriCap here, "are liable only if they had some role in causing the breach or dissipation of the trust." *Boulder Fruit*, 251 F.3d at 1272; Restatement (Second) of Trusts § 283 (1959) ("If the trustee transfers trust property to a third person . . . [without] commit[ting] a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.").

## C

Against this industry and legal background, a PACA trustee's true sale of accounts receivable for a commercially reasonable discount from the accounts' face value is not a dissipation of trust assets and, therefore, is not a breach of the PACA trustee's duties. *Nickey Gregory*, 597 F.3d at 598 ("The assets of the trust would thus have been converted into cash and the receivables would no longer have been trust assets. Obviously, under this scenario, [the factoring agent] would own the accounts receivable and would be able to do with them what it wished."); *Reaves Brokerage*, 336 F.3d at 413–14 (holding that "a 'bonafide purchaser' of trust assets receives the assets free of claims by trust beneficiaries" and noting that the determinative issue on appeal is whether the "factoring agreement" was a loan secured by accounts receivable or a true sale of accounts receivable); *Boulder Fruit*, 251 F.3d at 1271–72 ("[N]othing in PACA or the regulations prohibits PACA trustees from attempting to turn receivables into cash by factoring. To the contrary a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty."); *Endico Potatoes*, 67 F.3d at 1067–69 (noting that "the well recognized principle from trust law that a bona fide purchaser of trust assets receives the assets free of any claim

by the trust beneficiaries" was determinative, and because the financier had received only a security interest, its interest was subject to the rights of the growers).  That sale is, in substance, a conversion of trust assets from accounts receivable into cash.  *See Boulder Fruit*, 251 F.3d at 1271.

The Second, Fourth, and Fifth Circuits have held that any purported security interest for a lender in PACA-trust assets is inferior to the trust beneficiaries' claims and rights.  *See, e.g.*, *Nickey Gregory*, 597 F.3d at 598–99 ("Thus, if the accounts receivable were held by [the factoring agent] as collateral to secure repayment of a loan, they would also have been held for the benefit of produce sellers, and the produce sellers would have effectively enjoyed a first-creditor position in them."); *Endico Potatoes*, 67 F.3d at 1069 ("Because [the factoring agent] held only a security interest . . . its interest is subject to the rights of the PACA trust beneficiaries. . . . [The factoring agent] must, therefore, disgorge amounts collected on the accounts after [the distributor's] bankruptcy filing to the extent necessary to satisfy claims of PACA trust beneficiaries."); *A&J Produce*, 542 F.3d at 58 ("A creditor holding 'only a security interest,' therefore, retains that interest 'subject to the rights of the trust beneficiaries.'").   Notwithstanding the absence of discussion of a "true-sale" or "transfer-of-risk" test, even *Boulder Fruit* made clear that a lender's use of PACA-trust assets as collateral to secure a debt could not create a priority security interest ahead of the position enjoyed by PACA trust beneficiaries.[8]

---

[8] The Ninth Circuit stated:

> Farmer sells oranges on credit to Broker.  Broker turns around and sells the oranges on credit to Supermarket,

**IV**

The treatment of true sales and security interests under PACA and trust law is reasonably clear. But what is at issue here, and is not perfectly clear, is the proper analysis to apply when the true nature of the transaction is ambiguous—i.e., when it resembles a sale in some respects and yet looks like a secured transaction in others. Growers and the Second, Fourth, and Fifth Circuits would apply a threshold transfer-of-risk test to determine if a transaction is a true sale or is more accurately viewed as a secured lending relationship. AgriCap, relying on *Boulder Fruit*, argues vigorously that the court need only ask if the transaction was commercially reasonable.

**A**

*Boulder Fruit* held that factoring agreements do not *per se* breach the PACA trust because "a trustee can sell trust assets *unless* the sale breaches the trust." 251 F.3d at 1272. The court concluded that "a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA and 7 C.F.R.

---

> generating an account receivable from Supermarket. Broker then obtains a loan from Bank and grants Bank a security interest in the account receivable to secure the loan. Broker goes bankrupt. Under PACA, Broker is required to hold the receivable in trust for Farmer until Farmer was paid in full; use of the receivable as collateral was a breach of the trust. Therefore, Farmer's rights in the Supermarket receivable are superior to Bank's. In fact, as a trust asset, the Supermarket receivable is not even part of the bankruptcy estate.

*Boulder Fruit*, 251 F.3d at 1271.

§ 46.46(d)(1)—to maintain trust assets so that they are 'freely available to satisfy outstanding obligations to sellers of perishable commodities.'" *Id.* at 1271. *Boulder Fruit* reasoned that the commercial reasonableness of a factoring agreement depends upon the terms of the agreement. For example, "[a] PACA trustee who sells accounts for pennies on the dollar, just to turn a quick buck, might well have breached the PACA trust, while a trustee who factors accounts at a commercially reasonable rate would not." *Id.*

The *Boulder Fruit* panel, in reaching its conclusion, said that the factoring agreement "actually enhanced the trust." *Id.* at 1272. *Boulder Fruit* considered not only the initial up-front payment from the factoring agent to the distributor but also the actual sums paid to the distributor by the factoring agent while performing the factoring agreement.[9]  *Id. Boulder Fruit* did not, however, examine the substance of the rights transferred to determine what the factoring agent agreed to do, what risk the factoring agent accepted when it accepted the right to collect on the transferred accounts, and whether the transaction should properly be deemed a true sale rather than a mere secured lending arrangement. Rather, *Boulder Fruit* characterized the transaction as a sale or factoring agreement without discussing the factoring agent's rights and ability to seek recourse against the distributor.

In sharp contrast, the Second, Fourth, and Fifth Circuits found it necessary to examine the rights and risks transferred between the parties to a factoring agreement. The courts in

---

[9] The 20% discount at issue in *Boulder Fruit* represented a discount from the accounts' face value as paid in an initial payment from the factoring agent to the PACA trustee. It did not represent the final amount paid nor did it represent a floor or a ceiling on what the factoring agreement in *Boulder Fruit* could have required the factoring agent to pay.

these cases examined the text and legislative history of PACA and the regulations promulgated under PACA to conclude that Congress intended to promote the interests of produce growers above the interests of secured lenders. *See, e.g.*, *Nickey Gregory*, 597 F.3d at 594–95, 598–99; *Endico Potatoes*, 67 F.3d at 1066–68. The Fourth Circuit stressed that representatives of the secured lending community had voiced concern over PACA's likely effect upon secured lenders and the factoring industry. *Nickey Gregory*, 597 F.3d at 599. That court concluded that Congress nevertheless found that the balance of policy interests favored placing those lenders in a position inferior to unpaid growers. *Id.*

The *Endico Potatoes* court resolved a case wherein Merberg, a dealer in perishable agricultural commodities received financing from CIT, and CIT held security interests in all Merberg's assets including accounts receivable. 67 F.3d at 1066. Merberg went through a bankruptcy and the growers sought reimbursement from CIT for the amounts left unpaid. *Id.* The court defined the issue before it as whether the transaction between CIT and Merberg constituted a purchase for value or whether the exchange gave CIT no more than a security interest. *Id.* at 1068. The court reasoned, "[i]n determining the substance of the transaction, the Court may look to a number of factors, including the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces debt." *Id.* That court found, "[t]the root of all of these factors is the transfer of risk." *Id.* at 1069. The court relied upon the fact

that the agreement had a provision that let CIT demand payment at any time and a provision that terminated CIT's interest if Merberg paid its outstanding obligation. *Id.* The court held that because CIT only held a security interest in Merberg's accounts receivable, CIT's interest was subject to the rights of the PACA trust beneficiaries. *Id.*

A question may be raised whether the Second Circuit no longer espouses the view that the substance of an agreement must be analyzed when determining the rights of the parties. In *E. Armata, Inc. v. Korea Commercial Bank of New York*, 367 F.3d 123, 126 (2d Cir. 2004), the Second Circuit considered whether, under PACA, a bank was liable to the beneficiaries of a PACA trust for receipt of funds when the bank extended revolving overdraft privileges to the produce dealer and applied deposited PACA funds to reduce the negative balance in the produce dealer's overdrawn account. *Id.* The court, in concluding that the bank was not liable to PACA trust beneficiaries, reasoned that the bank did not breach the trust. *Id.* at 131; *see also American Banana Co., Inc. v. Republic Nat'l Bank of NY, N.A.*, 362 F.3d 33, 42 (2d Cir. 2004) ("Nor are we convinced that a trustee's payments of commercially reasonable fees and interest in exchange for routine banking services such as check cashing services and overdraft privileges extended to facilitate payments to beneficiaries constitute a breach of the PACA trust."). The Second Circuit in its *E. Armata* decision, while it cited *Boulder Fruit* for specified purposes,[10] did not purport to overrule *Endico Potatoes* or to limit it.

---

[10] Specifically, the court there said in part: "We agree with the Ninth Circuit in *Boulder Fruit*, that it is not a breach of trust for a PACA dealer to use PACA funds to enter into 'commercially reasonable' transactions with parties not protected by PACA, particularly where such transactions

A subsequent Second Circuit opinion, *A&J Produce Corp. v. Bronx Overall Economic Development Corp*, held that a lender who had a lien on trust assets held that lien "subject to the rights of the trust beneficiaries" i.e., the growers. 542 F.3d 54, 58 (2d Cir. 2008). It further noted that "[a]ny other result would elevate the rights of secured creditors above those of PACA creditors, contrary to the intent to the statute. *Id.* at 59; *see also Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 707 (2d Cir. 2007) (noting that in *E. Armata* they did not hold that any commercially reasonable transaction avoids breaching fiduciary responsibilities but that "whether a transaction is commercially reasonable is simply one factor that may be relevant in determining whether a PACA trustee has met its ultimate burden of proving that trust assets remained freely available to plaintiffs").

In *Reaves*, the Fifth Circuit considered a case where Reaves, a produce seller, sold produce to Sunbelt Fruit & Vegetable Company, a wholesaler, and Sunbelt ceased operations owing Reaves almost $200,000 in unpaid invoices. 336 F.3d at 412. Reaves sued Fidelity Factors, LLC, because Fidelity had purchased particular accounts receivable from Sunbelt. *Id.* The court framed the issue before it as whether the "factoring agreement" between Sunbelt and Fidelity was a loan secured by accounts receivable or a sale of accounts receivable. *Id.* at 414. The court reasoned that the "[c]haracterization of the agreement turns on the 'substance of the relationship' between Fidelity and Sunbelt, 'not simply the label attached to the transaction.'" *Id.* The court looked to the Second Circuit's risk-transfer analysis and also conducted an independent

facilitate a PACA dealer's fulfillment of his obligations to PACA beneficiaries." *Id.* at 133.

examination of the substance of the agreement and concluded that the relationship between Fidelity and Sunbelt was that of a secured lender and debtor. *Id.* The court reasoned that the agreement and its provisions, when read in their entirety, "confirm that the *risk* of non-payment or underpayment is entirely borne by Sunbelt." *Id.* at 415 (emphasis in original). The court pointed to continuing lien and single indebtedness language, a personal guaranty from Sunbelt's president, and recordation of the agreement with the UCC to support its conclusion. *Id.* at 416. The court also distinguished *Boulder Fruit* because it found that the commercially reasonable analysis did not apply when the factoring agreement is the "functional equivalent" of a secured lending agreement, noting that the "discrete issue before the *Boulder Fruit* court was whether an *acknowledged* factoring agreement was 'commercially reasonable'." *Id.* at 417 (emphasis in original).

In *Nickey Gregory*, the Fourth Circuit addressed a case where Robison Farms, a distributor of produce, bought produce from growers on short-term credit, and distributed the produce to restaurants and school systems on credit creating accounts receivable. 597 F.3d at 596. When Robison Farms began experiencing financial difficulties it sought a line of credit from AgriCap and assigned the accounts receivable to AgriCap in exchange for an advance of 80% of the face value of the accounts. *Id.* AgriCap collected the accounts receivable, kept the 80% for itself, and remitted the remaining 20% to Robison Farms minus fees and interest. *Id.* Notwithstanding the credit agreement, Robison Farms closed its doors without paying the growers what was owing and filed for bankruptcy. *Id.* at 596–97. The court framed the issue before it as whether the district court erred in concluding that AgriCap's transaction was a loan agreement. *Id* at 600. The Fourth Circuit upheld the

district court's conclusion that the transaction was a loan agreement because (1) AgriCap referred to itself as a "Lender" and Robison Farms a "Borrower" in the agreement, (2) Robison farms did not transfer risk of noncollection of accounts receivable to AgriCap—AgriCap had a right to demand that Robison Farms repurchase any receivable that went unpaid or was disputed, (3) documents related to the transaction referred to the accounts receivable as collateral for repayment, (4) AgriCap had a Subordination Agreement that gave it "a first priority security interest in the Collateral", (5) the owner of Robison Farms gave AgriCap a personal guarantee, and (6) AgriCap filed a UCC-1 Financing Statement for the transaction. *Id.* at 601–03. The court concluded that the substantive aspects of the transaction were inconsistent with a sale of assets, and that the transaction was in "essence a loan in the form of a revolving line of credit secured by accounts receivable." *Id.* at 603. The court finally concluded that because the transaction was a loan, the accounts receivable and their proceeds never left the PACA trust, and their proceeds had to be made available for payment of the claims of unpaid PACA creditors first. *Id.*

The Fourth Circuit distinguished *Boulder Fruit* concluding that in *Boulder Fruit* there was a "true factoring relationship, in which the receivables were actually sold to the factor." *Id.* at 604. The Fourth Circuit found that *Boulder Fruit* did not question whether there had actually been a sale. *Id.* at 604.

The weight of authority and reasoning in the Second, Fourth and Fifth Circuit cases suggest that "transfer of risk" and "true sale" considerations should be assessed before considering commercial reasonableness when considering the propriety of a transfer of trust assets. We conclude that

adoption of the transfer-of-risk test or true sale test is the logical outcome of a reading of PACA, PACA's legislative history, and consideration of PACA's purpose.

## B

Given the remedy that Congress created to alleviate the perceived problem of conflict in rights of agricultural growers and secured lenders—creation of the trust elevating commodities sellers' interests over lenders' interests— Congress's clear concern with the relative interests of secured lenders and commodities sellers, and the general contours of trust law—in particular, a trustee's ability to sell or convert trust assets—courts must focus on the true substance of PACA-related transactions and not on artificial indicators or labels.  It runs counter to PACA and its history to allow the simple use of the words "sale," "purchase," or "factoring agreement" to be central for purposes of assessing the relative rights of lenders and produce growers.

AgriCap at oral argument asserted that the AgriCap transaction benefitted Growers as AgriCap paid Tanimura more than the 80% discount on the accounts receivable and never used the recourse provision.  The Second, Fourth, and Fifth Circuits conclude, however, that a transfer of the primary or direct risk of non-payment on the accounts is the hallmark of a true sale.  *Nickey Gregory*, 597 F.3d at 601– 03; *Reaves Brokerage*, 336 F.3d at 417; *Endico Potatoes*, 67 F.3d at 1068–69. *See also In re Arctic Exp. Inc.*, 636 F.3d 781, 800 (6th Cir. 2011) ("The rationale of the Fourth Circuit's decision in *Nickey Gregory* is transferable to the case at bar, which involves a similar revolving loan agreement secured by Arctic's accounts receivable."). These courts and PACA regulations assess trust asset encumbrance in terms of what a factoring agreement could authorize and not in terms of what money was actually paid

to the trustee under the agreement. *See, e.g.*, 7 C.F.R. § 46.46(a)(2) ("'Dissipation' means any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions.").

In assessing whether a true sale occurred, the Fourth Circuit adopted the transfer-of-risk test developed by the Second Circuit in *Endico Potatoes*. *Nickey Gregory*, 597 F.3d at 600–03. There, the Second Circuit distinguished between direct risk and secondary or derivative risk. *Endico Potatoes*, 67 F.3d at 1068–69. The *Endico* court said that it was appropriate to examine several factors such as "[1] the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt." *Endico Potatoes*, 67 F.3d at 1068. The court in *Endico Potatoes* concluded: "The root of all of these factors is the transfer of risk." *Id.* at 1069. Finally, the court there summarized:

> Where the lender has *purchased* the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower

remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

*Id.* (emphasis in original).

We conclude that this transfer-of-risk test should be applied to avoid reliance on labels in factoring agreements that would defeat the purposes of PACA. As Judge Melloy reasoned in his separate concurrence in the three-judge panel's decision: "A factoring agent who accepts risk of non-payment on the transferred accounts is the owner of the accounts, for better or worse . . . [internal citation omitted]. That risk will be reflected in the price. A factoring agent who functionally serves only as a lender and collection firm, however, accepts accounts for collection but enjoys the right to force the distributor to repurchase non-performing accounts. Such a factoring agent faces much less risk—risk measured only by the limitations on the repurchase provisions and by the distributor's solvency and ability to perform under the agreement." *S & H Packing & Sales Co.*, 850 F.3d at 457. The price paid for the accounts with and without recourse will differ.

AgriCap nevertheless argues that adoption of the transfer-of-risk test would lead to absurd results in which a factoring agent remains liable to growers even though the factoring agent's payments to a distributor were sufficient, in theory, for the distributor to pay growers. AgriCap is wrong to describe such a scenario as absurd. It is instead the result of a congressional policy choice. There is an analogy in the relationship between general contractors, subcontractors, and property owners in the context of

mechanics' liens. It is well established that a property owner who makes final payment to a general contractor without first securing a release of subcontractors' mechanics' liens holds the property subject to those liens with exposure to the subcontractors' claims despite substantial payments to the general contractor. *See, e.g.*, *Jackson v. Flohr*, 227 F.2d 607, 611 (9th Cir. 1955) ("Mechanics' liens are provided by statute in order to give the furnisher of labor and material, security against the realty so that it is unnecessary to rely upon the personal responsibility of the contractor." ); *Brewer Corp. v. Point Ctr. Fin., Inc.*, 223 Cal. App. 4th 831, 839 (2014), *as modified on denial of reh'g* (Feb. 27, 2014) ("A mechanic's lien is a claim against real property, which may be filed if a claimant has provided labor or furnished materials for the property and has not been paid."); *Gary C. Tanko Well Drilling, Inc. v. Dodds*, 117 Cal. App. 3d 588, 593 (Ct. App. 1981) (explaining that a mechanic's lien is the remedy provided by the California Constitution for enforcing against the owner of property payment of the debt incurred for the performance of labor, or the furnishing of material used in construction). Unpaid subcontractors will have interests that prevail over the property owner (who may seek recourse against the general contractor, but who still face direct liability to the subcontractors on their liens). State legislative action places the interests of subcontractors ahead of those of property owners. Property owners must manage this risk by diligently ensuring that subcontractors' liens are released before giving full payment to a general contractor.

Similarly, by placing the burden of due diligence on lenders rather than growers, Congress was well aware of the effect it was imposing on the lending industry. As Judge Melloy previously observed, "Congress concluded, however, that lenders could adapt. The House Committee

expressly noted that anticipated improvements to commerce would offset the lenders' anticipated burdens." *S & H Packing & Sales Co.*, 850 F.3d at 458; *see also* H.R. Rep. No. 98-543 at *4 ("[T]he statutory trust requirements will not be a burden to lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry.").

The propriety of comparing the PACA situation to mechanics' liens finds support in an examination of the regulations promulgated under PACA. Again, the reasoning in Judge Melloy's concurrence is helpful: "These regulations do not ask whether a factoring arrangement in fact resulted in a transfer of funds sufficient to pay growers throughout the course of performance under a factoring agreement. Rather, the regulations ask whether such an arrangement could impair trust assets. *See* 7 C.F.R. § 46.46(a)(2). Just as a property owner must conduct due diligence to avoid liability to a subcontractor before making final payment to a general contractor, a factoring agent with knowledge of PACA must act with diligence. It does not matter that a factoring agent paid a distributor sufficient funds to pay growers any more than it matters that a property owner paid a general contractor sufficient funds to pay subcontractors. In light of these statutory and common law protections, it cannot properly be the case that a distributor and factoring agent may defeat trust beneficiaries' rights merely by invoking the labels 'sale' or 'factoring agreement.'" *S & H Packing & Sales Co.*, 850 F.3d at 458.

Further, there would seem to be no doubt that a legislature has the power to define and limit liens. *See Mercy Hosp. & Med. Ctr. v. Farmers Ins. Grp. of Companies,* 932 P.2d 210, 215 (Cal. 1997) ("Whatever principles might generally apply to liens, former section 3045.4 is a statutory, not a common law, lien.  The Legislature is, of course, free to define and limit such a lien, and has done so in this case."). As recognized under California law, when there are competing liens, "the text of the statute prevails if it establishes the priority to be accorded to the statutory lien." *County of San Bernardino v. Calderon*, 148 Cal. App. 4th 1103, 1112 (2007).  The *Calderon* court concluded that the California's statutory hospital lien did not have priority over other liens by right, stating, "other liens may take priority". *Id.* at 1113 (citing Cal. Civ. Code § 3045.4).  The court reasoned that the California legislature knew how to create express priority as evidenced by its treatment of a county's right to action against a third party for reimbursement, where the statute states that the county has a "first lien". *Id.* (citing Gov. Code § 23004.1).  Other examples of states creating priority interests over secured creditors are seen in Iowa's agricultural supply dealer lien statute and Wisconsin's tow truck statutory lien.  In Iowa, agricultural supply dealers have a "super priority" interest above bank lenders in the livestock of the farmers. *In re Schley*, 565 B.R. 655, 658 (Bankr. N.D. Iowa 2017) ("An agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien as provided in section 554.9102."); *see* Iowa Code § 570A.5.  In Wisconsin, a person who has the license to perform towing services and does so has a priority interest, up to a statutory amount, over a bank's lien and has a right to retain possession of the vehicle until its costs are satisfied. *See In re Ingram*, 508 B.R. 98, 102 (Bankr. E.D. Wis. 2014); Wis. Stat. § 779.415(1g)(a).  Indeed, whenever we deal with competing liens, whether established by

legislations or common law, we deal not with the question of whether a party has a valid debt obligation that is secured and should be paid, but rather with the question of which claimant to funds has priority.

Similarly here, Congress has made a clear policy choice giving PACA creditors priority over secured creditors. We must keep PACA's purpose in mind when reviewing transactions that may in substance limit that congressional policy.

**C**

The dissent is not incorrect in asserting that the distinction between a sale and a secured lending agreement does not ordinarily make a difference under general trust principles, so long as the transaction at issue is commercially reasonable. But we respectfully and forcefully disagree that this is true in the context of a PACA trust. *See Boulder Fruit*, 251 F.3d at 1271 ("[G]eneral trust principles [apply] to questions involving the PACA trust, unless those principles directly conflict with PACA.").

PACA was enacted to protect trust beneficiaries, who were often in the position of unsecured creditors, from receiving little or nothing when a distributor went bankrupt. *See* 7 U.S.C. § 499e(c)(1). The dissent is not completely blind to the policy motivation behind PACA of protecting growers over lenders, but we think the dissent gives too little weight to the protective purpose of PACA. The dissent strives to add protection for the benefit of lenders, but loses sight of the PACA statutory language establishing the PACA trust, and disregards the purpose of PACA to protect agricultural growers.

To accomplish its protective purpose, PACA subordinates all secured creditor rights to the rights of the unpaid growers and charges the PACA trustee to preserve the rights of trust beneficiaries by making sure that PACA trust assets—the accounts receivable—are not dissipated. *See id.* at § 499e(c)(2); 7 C.F.R. 46.46(d)(1) ("[Trustees] are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of section 2 of the Act."). When there is a sale of assets—as relevant here, accounts receivable—there is a conversion of the assets from one form, accounts receivable, to another, cash. *See Boulder Fruit*, 251 F.3d at 1271. The accounts receivable are no longer in the trust, and therefore, there cannot be a dissipation of trust assets from the buyer's later collection on those receivables.

When there is a secured lending agreement or loan, however, the accounts receivable remain trust assets and are only collateral to the lender. *See Nickey Gregory*, 597 F.3d at 603. In that context, the trustee under PACA is obligated not to dissipate those trust assets. *See id.* at 604. As the court in *Nickey Gregory* correctly concluded, in those circumstances, there is a breach of trust whenever the lender recovers its fee or percentage from the accounts receivable while the trust beneficiaries have not been fully compensated. 597 F.3d at 604; *see* 7 C.F.R. § 46.46(a)(2) (precluding the trustee from participating in "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions"). This does not mean that every loan or lending agreement made to a

distributor acts to breach a PACA trust, but it does mean that whenever a loan is made, a PACA trustee must be careful to ensure all trust beneficiaries are paid before the lender collects.  If a trustee gives a lender a security interest in PACA trust assets, and the growers are not fully repaid, that would be a breach of the PACA trust and a violation of PACA.

Here, whether the transaction at issue was a sale or a loan makes a difference because a sale removes the accounts receivable from the PACA trust while the enforcement of a loan in this case would have breached the PACA trust because AgriCap received its full payment while GW Palmer remained unpaid.  Therefore, the district court must determine whether the transaction was in substance a sale or a loan.[11]

---

[11] The dissent seeks to give financial institutions the edge in this case over agricultural growers.  But the analysis of the dissent is fundamentally flawed because it elevates the interests of financial institutions, the factoring organization AgriCap, over the interests of agricultural growers who PACA aimed to protect.  As examples:

- First, the dissent says that "[t]he majority posits that the growers have a priority lien on their produce, which allows the trust to accept the benefit of a loan agreement but disregard the obligation to repay it."  Dissent at 37.  But nowhere do we suggest that trusts are free to disregard their obligations to lenders.  A trustee cannot, however, enforce an obligation to a lender above its statutory obligation to trust beneficiaries to not dissipate trust assets.

- Second, the dissent suggests that if "the trustee still owed AgriCap money on the loan, then AgriCap would be entitled to foreclose its security interest on the accounts receivable according to the terms of the loan agreement."  Dissent at 53 n.15.  This argument exceeds what even the Appellee AgriCap

understands PACA to allow. AgriCap's counsel admitted during oral argument, that if it was a true lending agreement, any interest that it had in the accounts receivable as a creditor would be subordinate to the growers. Ninth Circuit Court of Appeals, *Oral Argument 14-56069 G.W. Palmer v. AgriCap Financial Corp.*, YouTube 27:07–28:47 (Sept. 20, 2017), https://www.youtube.com/watch?v=iikaXV7nkaw.Only an argument in desperation would ignore this concession.

- Third, the dissent contends that we have not considered the implications of our decision today. Dissent at 60–61 n.21. That is incorrect. We have stated what we believe to be the proper test for the district court to employ in the first instance, realizing the limits of our ability to review issues like damages when there is no prior development of the record on appeal on those and related issues. Our court should not participate in the dissent's interested speculation and conjecture on issues not before us.

- Fourth, the dissent offers no judicial authority supporting its view that under PACA a commercially reasonable lending agreement can displace the trust beneficiary rights of the agricultural growers. Further, while challenging the strength of the various circuit precedents that we contend are aligned with our decision, the dissent unmistakably concedes that its position would squarely conflict with the decision of the Fourth Circuit in *Nickey Gregory*. Dissent at 54–55. The dissent makes this concession arguing more or less that it thinks *Nickey Gregory* is "critically flawed." Dissent at 52. However, given the language and purposes of PACA, we see no reason why we should engineer a conflict with the Fourth Circuit's decision in *Nickey Gregory*. *See Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003) ("[W]e decline to create a circuit split unless there is a compelling reason to do so" particularly when "rules are best applied uniformly."); *CTIA-The Wireless Ass'n v. City of Berkeley, California*, 873 F.3d 774, 776 (9th Cir. 2017).

## V

Congress intended PACA to prevent secured lenders from defeating the rights of PACA-trust beneficiaries.  The growers in this Circuit will have effectively lost that protection if lenders gain protection by labeling what are in substance security agreements as if they were factoring agreements.  The Congressional focus upon the relative rights of these two groups, growers and lenders, is evident.  For this reason, before a court assesses the commercial reasonableness of a factoring agreement, it should first examine the substance of a factoring agreement to ensure that a true sale of the accounts receivable has occurred.  Absent a true sale, the labels surrounding a factoring agreement should be of little or no consequence.  The substance of the transaction controls.  If the substance of a transaction reveals a secured lending arrangement rather than a true sale, the accounts receivable remain trust assets.  In that case, unpaid trust beneficiaries will hold an interest in accounts receivable and their proceeds superior to all unsecured and secured creditors such that the trust beneficiaries should prevail.[12]

The dominant consideration here is that the Congress of the United States in its language in the PACA statute and in the policy considerations underlying PACA has made a clear choice that the rights of agricultural growers are to be given priority over the rights of secured lenders through the vehicle of the PACA trust.  If Tanimura made a true sale of its receivables to AgriCap, acting as a factor, and if it was for fair value and a commercially reasonable amount, then the

---

[12] We note that the calculation of damages, if applicable, is left to the district court to review in the first instance after determining the substance of the accounts receivable transactions.

PACA trust was not offended. But on the other hand, if the challenged transaction was not a true sale but rather a secured lending arrangement, then the plaintiff Growers have a claim that must be resolved in further proceedings. What makes this case difficult is that the challenged transaction has some features both of a sale and of a loan. On remand the district court may use all the tools at its disposal, consistent with what we have said in this opinion, including the taking of testimony and making findings of fact, to determine whether the agreement was in substance a true sale or in substance a lending agreement, and thereafter to proceed in a way consistent with this opinion.

We hold that before considering the commercial reasonableness of a transaction, a court must first apply a threshold true sale test for which the transfer-of-risk is a primary factor.[13] To the extent that our *en banc* opinion today contradicts *Boulder Fruit*, we overrule *Boulder Fruit*.

We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

Each party shall bear their own costs.

---

[13] There remain other questions about when the transactions are reviewed and whether to apply the test asset-by-asset or taken together. We leave to the district court's discretion to determine the appropriate procedure for conducting this analysis as the district court is in a better position to do so after briefing from the parties on these issues.

IKUTA, Circuit Judge, with whom HURWITZ and FRIEDLAND, Circuit Judges, join, dissenting:

Congress enacted the Perishable Agricultural Commodities Act (PACA) trust, 7 U.S.C. § 499e(c), to solve a simple problem. Most produce growers sell their products to distributors on credit. If the distributor goes bankrupt, the growers are mere unsecured creditors and may only get cents on the dollar. The distributor's secured creditors, by contrast, get first crack at the distributor's assets. To address this problem, PACA made the distributor a trustee, the growers beneficiaries, and the growers' produce (and any resulting proceeds) trust assets. Congress thus ensured that in bankruptcy, the proceeds from the sale of the growers' produce would be available to pay off the growers.

The appeal before us today poses a related scenario: If a PACA trustee borrows money from a lender (using the trust assets as collateral) in order to pay the growers, but the money runs out before all the growers are paid, does the lender have an obligation to make the unpaid growers whole? The majority says yes: if the trustee fails to reimburse the growers, the lender is on the hook. The majority posits that the growers have a priority lien on their produce, which allows the trust to accept the benefit of a loan agreement but disregard the obligation to repay it. Because this surprising conclusion is unmoored from both the text of PACA and settled principles of trust law, I dissent.

I

Congress initially enacted PACA, 7 U.S.C. §§ 499a–499t, in 1930 to protect growers who marketed and sold their produce through intermediaries. PACA did not originally make growers beneficiaries of a trust. Rather, it required all intermediary distributors—commission merchants, dealers,

and brokers—to operate under licenses issued by the Secretary of Agriculture. 7 U.S.C. §§ 499c, 499d (1930). PACA also prohibited these distributors from engaging in a number of unfair business practices, such as failing to make prompt and full payment to growers. *Id.* §§ 499b, 499e.

Over time, it became evident that PACA gave growers insufficient protection when distributors went bankrupt. H.R. Rep. No. 98-543, at 3 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 405, 407. As the House Committee explained in its report on the proposed 1984 Amendments, sales of perishable goods "must be made quickly or they are not made at all." *Id.* As a result, produce growers are usually compelled to sell their goods on credit, even though it is "often difficult to make credit checks, conditional sales agreements, and tak[e] other traditional safeguards." *Id.*

This led to especially harsh consequences when distributors went bankrupt. Distributors typically operate "on bank loans secured by the inventories, proceeds or assigned receivables from sales of perishable agricultural commodities." *Id.* Before Congress intervened, a distributor could give the lender a security interest in all its assets, including the produce it had purchased from growers on credit and accounts receivable it received from the sale of the produce to retailers. If the distributor went bankrupt, the lender would have a secured claim in everything the distributor owned. In contrast, the growers would be "unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by the contract." *Id.* The unsecured growers would often receive only cents on the dollar on the distributor's unsecured IOUs. *See A Bill to Amend the Perishable Agricultural Commodities Act, 1930: Hearing on S. 2052 Before the Subcomm. on Agric. Prod., Mktg. &*

*Stabilization of Prices of the S. Comm. on Agric., Nutrition & Forestry*, 98th Cong. 14 (1983) (statement of Keith Eckel, President, Pennsylvania Farmers' Association, on behalf of American Farm Bureau Federation). A bankruptcy court could even recapture payments the distributor had made to a grower within 90 days of a bankruptcy and use them to pay other creditors. *Id.*; *see also* 11 U.S.C. § 547.

In light of this concern, Congress added a trust mechanism to PACA in 1984. H.R. Rep. No. 98-543, at 4. The 1984 Amendments' operative trust provision, 7 U.S.C. § 499e(c)(2), requires a distributor to hold "perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products . . . in trust for the benefit of all unpaid suppliers or sellers" until the distributor makes full payment to its growers.[1] This means that the distributor is a trustee, the growers' produce (and all proceeds from sales of the produce) are the trust res, and the growers are beneficiaries.

## A

We "apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with

---

[1] The 1984 Amendments also created a procedure for enforcing trust rights. Section 499e(c)(3) provided that a beneficiary must preserve its right to benefits by issuing written notice to the trustee within 30 days after the trustee's failure to make payment. 7 U.S.C. § 499e(c)(3). Section 499e(c)(4) allowed a beneficiary to alternatively preserve its rights through standardized language on billing or invoice statements. Section 499e(c)(5) vested jurisdiction in federal district courts to hear "(i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust." The plaintiffs in this case included the standardized language on their invoices to Tanimura Distributing, Inc. (TDI).

PACA." *Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001); *see also Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995). Like other circuits, we have turned to the Restatement of Trusts for those principles.[2] *See, e.g.*, *Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591, 605–06 (4th Cir. 2010)*; Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413–14 & nn.17–18 (5th Cir. 2003); *Boulder Fruit*, 251 F.3d at 1271–72; *Endico Potatoes*, 67 F.3d at 1067–68; *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1380 (3d Cir. 1994); *C.H. Robinson Co. v. Tr. Co. Bank*, *N.A.*, 952 F.2d 1311, 1313–14 (11th Cir. 1992).

Two key principles of trust law are crucial to understanding the trust mechanism in PACA. First, by making the distributor a trustee and the growers' produce and the proceeds trust assets, Congress transformed how these assets are treated in bankruptcy. A PACA trustee-distributor wears two hats in a bankruptcy proceeding. All of the debtor's own assets are subject to the claims of its creditors. But the trust assets do not belong to the debtor; the distributor as trustee holds only a nonbeneficial, bare legal title to such assets. Restatement (Third) of Trusts § 42

---

[2] The current trend is to rely on both the Second and Third Restatements of Trusts. *See, e.g.*, *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177–78, 183–84 (2011) (relying on both the Second and Third Restatement); *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166–67 (9th Cir. 2012) (same); *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP*, 201 Cal. App. 4th 368, 379 (2011) ("California trust law is essentially derived from the Restatement Second of Trusts. Over a number of years, the Restatement Second of Trusts has been superseded by the Restatement Third of Trusts. As a result, we may look to the Restatement Third of Trusts for guidance.").

(Am. Law Inst. 2003). Therefore, the trust assets are not part of the debtor's bankruptcy estate. *See* 11 U.S.C. § 541(b), (d); *United States v. Whiting Pools, Inc*., 462 U.S. 198, 205 n.10 (1983) ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate.); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997); Restatement (Third) of Trusts § 42 cmt. c ("[T]he trustee's personal creditors or trustee in bankruptcy may not reach either the trust property or the trustee's nonbeneficial interest therein.").

Second, by making the distributor a trustee of the PACA trust, Congress authorized the distributor to manage the produce and any resulting assets for the growers' benefit, subject to the standards that govern trustees.[3] Under basic trust principles, a trustee has the same powers over trust property as any other owner of property, "except as limited by statute or the terms of the trust," *id.* § 85; *accord* Unif. Trust Code § 815 (Unif. Law Comm'n 2000). This includes the authority "to sell trust property . . . in exchange for other property," Restatement (Third) of Trusts § 86 cmt. c, and the "power to borrow money for trust purposes and to pledge, mortgage, grant a deed of trust, or otherwise encumber trust property," *id.* § 86 cmt. d. Any money obtained from such transactions becomes an asset of the trust estate. Third-party lenders or purchasers dealing with a trustee generally hold the assets or security interest free of the trust. *See*

---

[3] Because the PACA trust is a "nonsegregated 'floating' trust," it permits "[c]ommingling of trust assets." 7 C.F.R. § 46.46(b); H.R. Rep. No. 98-543, at 4. Commingling relieves trustees of the burden "to specifically identify all of the trust assets through each step" of administering the trust. H.R. Rep. No. 98-543, at 5.

Restatement (Second) of Trusts § 283 (Am. Law. Inst. 1959).[4]  The buyer or lender has no duty to "ensure that assets transferred to the trustee are properly applied to trust purposes."  Restatement (Third) of Trusts § 108(3)(b). Even when the trustee breaches its fiduciary duty, someone who "takes for value and without notice of the breach of trust," is a "bona fide" transferee, "holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary."  Restatement (Second) of Trusts § 284.[5]

There is an important exception to this rule.  If (1) the trustee breaches its fiduciary duties when selling a trust asset or granting a security interest in a trust asset, *and* (2) the third party is on notice of this breach, the third party does not take the asset or security interest free of the trust.  Restatement (Second) of Trusts § 288.  Rather, the third party takes the asset in "a constructive trust for the beneficiary of the trust," *id.* § 288 cmt. a., and may be compelled to restore the asset

---

[4] Restatement (Second) of Trusts § 283 states:

> If the trustee transfers trust property to a third person or creates a legal or equitable interest in the subject matter of the trust in a third person, and the trustee in making the transfer or in creating the interest does not commit a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.

[5] Although the Second Restatement uses the term "bona fide purchaser," the term also applies when the trustee "creates a legal interest" in trust property, § 284(1), such as by giving "a legal mortgage or pledge or legal lien upon the trust property," *id.* § 284 cmt. g.  In other words, a lender's security interest may be protected by the bona fide purchaser defense, even if the trustee breached its fiduciary duty by granting the interest.

or any proceeds derived from it, *id.* § 291(1).[6] A trustee may breach its fiduciary duties by failing to "exercise caution . . . care and skill in deciding whether and under what terms to borrow money for trust purposes or to grant a security interest in trust property," Restatement (Third) of Trusts § 86 cmt. d, or by acting in a similarly careless manner when selling trust property, *id.* § 86 cmts. b, c. Therefore, a trustee breaches its fiduciary duty if it enters into an agreement with a third party that is not commercially reasonable. *See Boulder Fruit*, 251 F.3d at 1271–72.[7]

---

[6] Equity recognizes some exceptions to this rule. A third party that has conferred a benefit on the trust estate may be entitled to reimbursement from trust assets. *See, e.g.*, Restatement (Second) of Trusts § 291 cmt. o ("If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust and who pays value for the trust property, and the beneficiary compels him to restore the property to the trust or to account for its value or for the proceeds, the transferee is entitled to credit for the amount which he paid for the trust property to the extent to which the trust estate has the benefit thereof."); *id.* § 269 ("A person who has conferred a benefit on the trust estate and cannot obtain satisfaction of his claim out of the trustee's individual property can by a proceeding in equity reach trust property and apply it to the satisfaction of his claim to the extent to which the trust estate has been benefited, unless under the circumstances it is inequitable to allow him such remedy."); *see also Thomas v. Provident Life & Tr. Co.*, 138 F. 348, 349 (9th Cir. 1905) (holding that even if the trustee granted a lender a mortgage on trust property in breach of the trust, the trust estate "having received the benefit of the money, ought, in equity, to repay it, with interest.").

[7] The breaching trustee is also liable to the beneficiaries. "[I]f the trustee wrongfully uses trust money in his own business, or if he lends trust money to himself, the beneficiary can impose a constructive trust or equitable lien upon the proceeds if he can trace them." Restatement (Second) of Trusts § 202 cmt. e.

Nothing in PACA alters these basic trust principles. A PACA trustee, like any other trustee, has authority to sell trust assets or borrow money secured by an interest in trust property. *See* Preamble to Regulations Under the Perishable Agricultural Commodities Act, 49 Fed. Reg. 45,735, 45,738 (Nov. 20, 1984) (codified at 7 C.F.R. pt. 46) (stating that "the regulations do not prohibit a buyer or receiver from granting a secured interest in trust assets"); *see also Nickey Gregory*, 597 F.3d at 600 (holding that PACA permits the PACA trustee to transfer accounts receivable to a lender "*as collateral for a secured loan*"). And like any trustee, a PACA trustee is liable if it breaches its fiduciary duty. The Department's regulations require the distributor-trustee to maintain trust assets "to satisfy outstanding obligations to sellers of perishable agricultural commodities" and prohibit "[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets." 7 C.F.R. § 46.46(d)(1).[8]

## B

The facts in this case must be understood in light of these principles. Tanimura Distributing, Inc. (TDI) was in the business of distributing produce. TDI bought produce on credit from numerous growers, including the plaintiffs in this action (collectively, "Palmer"). TDI then resold this produce to retail outlets, usually on credit. Under a Factoring Agreement, TDI gave Agricap Financial Corp. an interest in

---

[8] Dissipation is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2).

the retailers' IOUs (i.e., TDI's accounts receivable) in exchange for the cash TDI needed to pay its growers.

These relationships are easier to understand by using a hypothetical example. Let's say Palmer sells four bushels of tomatoes to TDI for $100 on credit. Per PACA, TDI holds the bushels in trust. *See* 7 U.S.C. § 499e(c)(2). TDI (as trustee) then sells the four bushels to Safeway for $200, and takes back an IOU, which is an asset of the trust. Under the Factoring Agreement, TDI assigns the $200 Safeway IOU to AgriCap as the "absolute owner." In exchange, AgriCap promptly pays TDI 80 percent of the face value of the $200 account receivable, $160. This $160 becomes an asset of the trust, held by TDI for the benefit of Palmer and other growers who sell to TDI on credit. After AgriCap collects the $200 from Safeway, it pays TDI the remaining 20 percent of the face value of the account receivable, less a 3 percent finance fee.[9] This payment becomes part of the trust corpus. Assuming Safeway paid on time, AgriCap would pay $34 to TDI, for a total payment of $194 for the benefit of the trust.

The Factoring Agreement provided AgriCap some protections in exchange for taking the risk that the receivables would not be collectible. Among other things, AgriCap could require TDI to repurchase accounts receivable in certain circumstances, primarily if TDI had made an error in calculating the amount of produce sold to

---

[9] Under the terms of the Agreement, AgriCap's fees were only 1.5 percent, meaning that TDI would get 98.5 percent of the face value of each account receivable. In practice, AgriCap asserts that it paid TDI on average 97 percent of the receivable's value, and Palmer does not contend otherwise. Earlier in this litigation, AgriCap stated that it paid 98.2 percent on average. The district court did not make a finding on the actual amount paid, but estimated that it was "likely in the 90% range."

Safeway, and the Agreement required TDI to take back accounts receivable that were uncollectible after 90 days. However, AgriCap assumed the risk of loss in the event that Safeway became insolvent.

In sum, TDI received an 80 percent advance on the value of its accounts receivable and would receive up to 97 percent of their face value. Because PACA creates a nonsegregated floating trust, TDI was statutorily authorized to use the money it received from AgriCap to pay all the growers, including Palmer, and with the 80 percent advance on each account receivable, was able to do so with increased speed.

Although the Factoring Agreement states that TDI sold the accounts receivable to AgriCap, it is possible, as the majority suggests, to characterize the transaction as a loan. Maj. Op. at 12. If the arrangement is viewed as a loan, TDI, acting as a trustee, has borrowed $160 from AgriCap for the benefit of all the growers (the beneficiaries), and assigned the $200 Safeway account receivable to AgriCap as security for the loan. A lender taking only a security interest in an account receivable would typically not have any ability to collect the account receivable (unless the borrower defaulted). But the Factoring Agreement provides that once the $200 account receivable is assigned to AgriCap, it is the sole entity authorized to collect it. Therefore, to maintain the recharacterization of this transaction as a loan, we must view TDI as authorizing AgriCap to act as its collection agency, in addition to AgriCap's role as secured lender. *See Nickey Gregory*, 597 F.3d at 603 (explaining, in the context of a similar agreement, that if the third party was "not a purchaser of the accounts receivable," then it was "a lender and collection agent"). As TDI's agent, AgriCap collects the $200 that Safeway owed TDI. Those funds are used to pay back the $160 loan to AgriCap, plus a $6 finance fee, leaving

an additional $34 for the benefit of the growers (thus obtaining a grand total of $194 cash from the sale of the four bushels of tomatoes to Safeway).

This relationship—however characterized—broke down in August 2008, when TDI failed to pay Palmer amounts owed for its produce. After Palmer sued TDI, the distributor filed for Chapter 7 bankruptcy protection. *In re Tanimura Distrib., Inc.*, No. 2:08-bk-22644-TD (Bankr. C.D. Cal. Aug. 13, 2008), ECF No. 1.

When it declared bankruptcy, TDI owed Palmer roughly $845,000.[10] Absent PACA, Palmer would have been an unsecured creditor. Instead, the assets of the PACA trust were available for distribution to Palmer, and TDI's secured creditors could not touch them. The administrator of TDI's bankruptcy estate thus went about "identifying, recovering, and liquidating the PACA trust assets of [TDI] and preserving those funds for the benefit of all PACA trust creditors." Stipulation for Order Establishing PACA Trust Claims Procedure and Surcharge for Administrative Expenses at 11, *In re Tanimura Distrib., Inc.*, No. 2:08-bk-22644-TD, (Bankr. C.D. Cal. Jan. 26, 2009), ECF No. 60 (approved by bankruptcy court, ECF No. 67).[11]

After TDI's bankruptcy filing, Palmer added AgriCap to its complaint in this case, alleging that TDI's accounts receivable were PACA trust assets and AgriCap should

---

[10] In its initial complaint, Palmer sought to recover approximately $882,000 in unpaid debts from produce sales, but now seeks only $845,000.

[11] TDI's bankruptcy estate has now been fully distributed. *See* Chapter 7 Trustee's Final Account, *In re Tanimura Distrib., Inc.*, No. 2:08-bk-22644-TD, (Bankr. C.D. Cal. Aug. 7, 2014), ECF No. 262.

return them to Palmer.  In its motion for summary judgment, Palmer argued that TDI breached its fiduciary duty by granting AgriCap a security interest in accounts receivable from the sale of Palmer's produce and by transferring those accounts receivable to AgriCap.  Further, Palmer claimed, AgriCap knew TDI was in breach of trust and is therefore liable to Palmer for the value of the accounts receivable that TDI transferred to AgriCap.  In effect, Palmer's summary judgment motion claims that because TDI did not pay Palmer the $160 it initially borrowed from AgriCap, AgriCap has to make good on TDI's obligation.

## II

Under trust law, AgriCap's potential liability primarily turns on whether the TDI breached its fiduciary duty.  As explained above, if TDI breached its fiduciary duty to Palmer and the growers by entering into the Factoring Agreement or by performing its obligations under the Factoring Agreement, and AgriCap was on notice of the breach, AgriCap would hold any security interest in the trust assets or any proceeds derived from those assets, in a constructive trust for the benefit of the growers.

Because a PACA trustee can give a lender a security interest in trust assets, TDI did not breach its fiduciary duty to the growers merely by entering into the Factoring Agreement.  The parties do not argue that the Factoring Agreement is commercially unreasonable; indeed, there would be no basis for doing so.  In our example, TDI as trustee would get $194, or 97 percent of the $200 account receivable.  This far exceeds the 80 percent return that we have approved in the sale of assets.  *See Boulder Fruit*, 251 F.3d at 1272 ("[A] factoring discount of 20% was never shown to be commercially unreasonable").  And, in the loan scenario, AgriCap is merely acting as a collection agent, and

it would not be commercially unreasonable for a creditor to agree that its collection agent can return accounts receivable that are uncollectible.  Moreover, if TDI takes back the $200 uncollectible account receivable, TDI is no worse off than it was before it authorized AgriCap to collect the account receivable; TDI retains the asset, which has the same value before and after its transaction with AgriCap.  After entering into the Factoring Agreement, TDI as trustee was bound by its terms (assuming AgriCap did not breach the agreement).  If entering into the Factoring Agreement did not breach TDI's fiduciary duties, then neither did complying with its terms.  *See* Restatement (Third) of Trusts § 88 cmt. b (explaining that "if a trustee borrows funds from a third party for use in the administration of the trust, the interest on the loan is payable (or reimbursable) from the trust estate," so long as the terms are "reasonable and the borrowing serves an appropriate trust purpose and is otherwise consistent with the trustee's fiduciary duties"); Austin W. Scott et. al., Scott and Ascher on Trusts § 26.2 (5th ed. 2007) (noting that the trust estate remains liable for performing a contract entered into by the trustee, even when the contract "is not in all respects proper").  Indeed, no party argues that the Factoring Agreement is commercially unreasonable because it does not include a term that would allow TDI to delay making required loan payments until after all growers who provide produce to TDI have been fully paid.[12]

In short, TDI did not breach its fiduciary duties as trustee when it entered into an agreement under which it received an 80 percent advance on each account receivable in exchange for repaying the advance plus a fee of 3 percent.

---

[12] As indicated below, *infra* at p. 54, because PACA is a non-segregated floating trust, such a term would likely prevent TDI from every repaying a lender.

Nor did TDI breach its fiduciary duties by complying with the terms of this agreement, which required TDI to repay the money borrowed from AgriCap. Therefore, AgriCap holds its interest in the accounts receivable and loan payments free of the trust. *See* Restatement (Second) of Trusts § 283. Under principles applicable to all trusts, including PACA trusts, AgriCap has no liability to Palmer or any other grower.

## III

The majority agrees that basic trust principles apply to PACA trusts. Maj. Op. at 15. It also agrees that trust assets are excluded from the distributor's bankruptcy estate if the distributor goes bankrupt. Maj. Op. at 15. It agrees that if a trustee "transfers trust property to a third person . . . [without] commit[ting] a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary." Maj. Op. at 16 (quoting Restatement (Second) of Trusts § 283). Finally, the majority agrees that a trustee can give a lender a security interest in PACA trust assets without violating PACA. Maj. Op. at 32–33.

So how does the majority nonetheless reach the striking conclusion that if the Factoring Agreement is deemed to be a loan transaction, then AgriCap, which paid TDI $194 for a $200 trust asset, is liable to Palmer for the same $200?[13] *See* Maj. Op. at 27–28. The majority reasons that under a loan

---

[13] If described as a loan, this means that after TDI borrowed $194 and subsequently repaid the $194 loan (plus fees) to AgriCap, AgriCap must return the $194 plus fees to TDI, with no prospect of ever getting its loan repaid.

scenario, even if TDI did not breach its fiduciary duties by *entering into* a loan agreement, it breached them by *complying with* the terms of the loan agreement and repaying AgriCap's loan.   According to the majority's analysis, because TDI repaid AgriCap's loan before Palmer was paid (regardless whether TDI used AgriCap's loan to pay other growers), AgriCap must make Palmer whole.[14]  Maj. Op. at 33.  As explained below, this conclusion is not based in PACA or trust law, is contrary to our precedent, and cannot reasonably be applied to these transactions.

In reaching its conclusion that a trustee would breach its fiduciary duty by *repaying* the loan from trust assets "while the trust beneficiaries have not been fully compensated," Maj. Op. at 32, the majority relies on *Nickey Gregory Co. v. AgriCap, LLC*, which analyzed a similar agreement between AgriCap and a PACA trustee.  *See* 597 F.3d at 596, 601–02. The Fourth Circuit reasoned that the trustee's arrangement with AgriCap "authorized trust assets to be used to repay AgriCap ahead of the commodities sellers, who went unpaid," and such an arrangement "breached the PACA

---

[14] More precisely, the majority states that a trustee breaches its fiduciary duties "whenever the lender recovers its fee or percentage from the accounts receivable while the trust beneficiaries have not been fully compensated." Maj. Op. at 32.  It is not clear whether the majority deems the breach to be limited to a trustee's payment of interest to a lender, or deems the trustee's repayment of principal to the lender to also be a breach of trust.  Nor does the majority make clear whether a lender must return only the interest it received on the loan or must also return the repayment of principal.  Nevertheless, the majority's adoption of this analysis indicates that the majority assumes the lender must return both interest and principal to the trustee.  *See Nickey Gregory*, 597 F.3d at 606–07 (rejecting AgriCap's alternative argument that it should be required to disgorge only "the amount it received in interest and fees" and instead requiring it to disgorge all collections on receivables up to the amount of growers' claims).

trust," because the trustee "was obligated to ensure that trust assets remained freely available to pay PACA creditors first." *Id.* at 604. Accordingly, the Fourth Circuit concluded that "AgriCap, as a third-party transferee of the trust assets, must, under established trust principles, disgorge the proceeds of the receivables unless it has a defense." *Id.*

The majority adopts this reasoning. While conceding that this result has no basis in trust principles, Maj. Op. at 31, the majority contends that this result is required by PACA, and quotes the regulation stating that PACA trustees "are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities," and this precludes a trustee from repaying a loan to the trust. Maj. Op. at 32 (quoting 7 C.F.R. § 46.46(d)(1)).

The majority's analysis, like that in *Nickey Gregory*, is critically flawed. First, the majority misunderstands the nature of trust assets. In the case of a loan, the trustee maintains two assets available for the growers: the $194 that the trustee received from the lender ($160 as an advance, $34 post-collection), and the accounts receivable subject to the lender's $160 lien. The trustee's repayment of the $160 to the lender does not dissipate the trust's assets, because the trust is not entitled to that $160 under the terms of the loan agreement. The typical produce sales arrangement seems more questionable under the majority's reasoning, because TDI relinquished the produce (an asset of the estate that is no longer freely available to the growers) to Safeway, and received only a promise to pay in return. Of course, Congress did not intend to preclude this sort of arrangement.

Second, the majority misunderstands the nature of a trustee's obligation in a loan agreement. Just like any trustee who takes out a loan for the benefit of the beneficiaries and

uses trust assets as collateral, the PACA trustee must repay the loan according to the terms of the loan agreement, and the secured lender's lien on those trust assets remains enforceable if the loan is not repaid.[15]  Failure to pay the loan according to its terms would constitute a breach of the trustee's fiduciary duties.  *See* Scott et al., *supra*, § 17.8 ("A trustee of property subject to a mortgage must take reasonable steps to prevent loss of the property by foreclosure.").  The majority cites nothing in PACA that

---

[15] At oral argument, AgriCap's counsel stated that the trust estate no longer contains any uncollected accounts receivable subject to a security interest, and so such accounts receivable are not at issue in this appeal.  U.S. Court of Appeals for the Ninth Circuit Court, *Oral Argument 14-56059 G.W. Palmer & Co. v. AgriCap Fin. Corp.*, YouTube 28:30–28:50 (Sept. 20, 2017), https://www.youtube.com/watch?v=iikaXV7nkaw.

But were the issue before us, basic principles of trust law establish that AgriCap would have the same rights with respect to those accounts receivables as it would to the proceeds. If TDI, as trustee, did not breach its fiduciary duties when it borrowed money from AgriCap (or AgriCap did not have knowledge of the breach), and the trustee still owed AgriCap money on the loan, then AgriCap would be entitled to foreclose its security interest on the accounts receivable according to the terms of the loan agreement. *See* Restatement (Second) of Trusts §§ 283–84, 288 (explaining that a third-party lender holds its security interest in trust property free of the trust unless the grant of the interest was a breach of the trustee's fiduciary duty, the lender had notice, and the lender did not give value).

While AgriCap's counsel stated in response to questioning that a lender's interest in the accounts receivable would be subordinate to the growers' interests as beneficiaries, Maj. Op. at 33 n.11, we do not construe statutes based on passing statements at oral argument. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) (per curiam) ("[T]he concession of a point on appeal by [a party] is by no means dispositive of a legal issue."). Here, the growers' interests would be superior only to creditors of TDI as a debtor, not to creditors of TDI as trustee.

allows the trustee to disregard such an obligation, and we "do not construe statutes in a manner that would lead to absurd results," nor "impute to Congress an intent to create a law that produces an unreasonable result." *United States v. Casasola*, 670 F.3d 1023, 1029 (9th Cir. 2012).

Indeed, the majority's theory of breach—that the trustee cannot repay a loan to the trust until all beneficiaries have been paid—would likely preclude a trustee from borrowing money secured by trust assets. Because PACA is a non-segregated floating trust, 7 C.F.R. § 46.46(b), each grower has a claim on the trust assets, whether they were acquired before or after the grower sold its produce to the trustee. *See In re Kornblum & Co., Inc.*, 81 F.3d 280, 286 (2d Cir. 1996) (holding that "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full."). So long as the trustee continues to purchase produce from growers on credit, there will be new growers who have not yet been paid and therefore the trustee would be precluded from repaying any lender from the trust assets. No lender would enter into a loan agreement if the law precluded repayment of the loan.

Perhaps realizing that there is no statutory basis for holding that a PACA trustee cannot repay a lender pursuant to the terms of the loan agreement, the majority posits that if a PACA trustee borrows from a lender, and secures the loan with an interest in trust property, the beneficiaries have a priority lien on the trust property over all other lenders. Maj. Op. at 27–28. The majority analogizes to circumstances where state law protects a creditor by giving that creditor a priority lien over all other creditors. Maj. Op. at 27–31.

This framework, however, is divorced from the language of PACA and basic principles of trust law. Congress could

well have provided that when a distributor purchases a grower's produce on credit, the grower would be deemed, by operation of law, to have a lien on that produce (and its proceeds) that has priority over the liens of all other creditors. But, there is nothing to this effect in PACA. Rather, Congress elected to rely on a trust mechanism, and to protect growers by making the distributor a trustee holding their proceeds in trust. *See* 7 U.S.C. § 499e(c)(2). A beneficiary of a trust does not have any lien on trust assets, let alone a priority lien.[16]

Although the majority purports to follow the lead of three other circuits, only the Fourth Circuit has adopted the theory that a trustee's loan repayments in the ordinary course of business are a breach of trust. In *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413–14 (5th Cir. 2003), and *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067–68 (2d Cir. 1995), the courts analyzed whether a transaction between a PACA trustee and a third party constituted a loan or "true sale" in order to determine whether the transferee was a bona fide purchaser under section 284 of the Restatement

---

[16] Although the Department of Agriculture stated in the preamble to its regulations that a lender that takes a secured interest in a PACA trust asset takes "a secured interest [that] is secondary and specifically voidable in order to satisfy debts to unpaid suppliers, sellers, or agents in perishable agricultural commodity transactions," Preamble to Regulations Under the Perishable Agricultural Commodities Act, 49 Fed. Reg. at 45,738, this language is contrary to the language of the statute and the regulations themselves, and so merits no weight, *see Mines v. Sullivan*, 981 F.2d 1068, 1070 (9th Cir. 1992) ("A court need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the wording of the regulation or inconsistent with the statute under which the regulations were promulgated.").

(Second) of Trusts.**[17]**   Since section 284 applies only if the trustee breaches its fiduciary duty, *see supra* p. 42; *Boulder Fruit*, 251 F.3d at 1272 ("Whether a transferee of trust assets is a bona fide purchaser becomes relevant only as a defense after it has been determined that a breach of trust has occurred."), those courts necessarily presumed that a breach had occurred, but did not explain their theory.**[18]**   None suggested that the trustee's repayment of a loan according to its terms constituted a breach of the trustee's fiduciary duty.

Moreover, the Second Circuit has recognized, consistent with *Boulder Fruit*, "that it is not a breach of trust for a PACA dealer to use PACA funds to enter into 'commercially reasonable' transactions with parties not protected by PACA, particularly where such transactions facilitate a PACA dealer's fulfillment of his obligations to PACA beneficiaries." *E. Armata, Inc. v. Korea Commercial Bank of N.Y.*, 367 F.3d 123, 133 (2d Cir. 2004); *see also D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 96 (2d Cir. 2005) (holding that a third-party bank was not liable for its receipt of a PACA trustee's account fees, interest, and any other funds whose "retention was commercially reasonable").

---

**[17]** As explained above, the bona fide purchaser defense applies equally to a lender's security interest in trust assets or the purchase of trust assets. *See supra* p. 42 n.5; Restatement (Second) of Trusts § 284 & cmt. g.

**[18]** The majority also cites *A & J Produce Corp. v. Bronx Overall Economic Development Corp.*, which relied on *Reaves* and *Endico Potatoes* for the proposition that a lender is not a bona fide purchaser for value, but likewise failed to identify any breach by the trustee. 542 F.3d 54, 58–59 (2d Cir. 2008).

Nor does the majority explain how its analytic framework applies to the facts in this case. If the Factoring Agreement is in fact a loan agreement, then AgriCap loaned TDI between \$19,057,000 and \$20,425,000 for many different accounts receivable, and TDI ultimately paid back (through AgriCap's collections on the accounts receivable) some amount up to the loan amount plus a finance fee for each of those accounts receivable.[19] Although the majority indicates that AgriCap is liable to Palmer for some portion of the money AgriCap received in repayment of its \$19–20 million in loans, the majority gives no direction to the district court on how to determine the extent to which AgriCap is liable. To the extent the majority's reasoning would require AgriCap to repay principal and interest on its loan, the majority effectively makes the factor the trustee's guarantor, who must make the beneficiaries whole if the trustee does not do so. But it is already settled that "third parties are not guarantors of the PACA trust." *Boulder Fruit*, 251 F.3d at 1272; *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1381 (3d Cir. 1994) ("The produce purchaser is the trustee of the trust and creditors are not insurers of unpaid beneficiaries when they receive trust assets in breach of trust."); *C.H. Robinson Co. v. Tr. Co. Bank, N.A.*, 952 F.2d 1311, 1316 (11th Cir. 1992) ("Secured lenders are not guarantors of PACA trusts.").

At bottom, the majority's concern appears to be that trust principles are insufficiently protective of growers here. But the majority offers no principled distinction for why a trustee can sell produce for cash, sell an account receivable for cash, but not borrow cash secured by the produce or account receivable, even though the trustee gets substantially the

---

[19] The parties dispute the amounts AgriCap loaned to TDI and the amounts that TDI repaid AgriCap.

same amount of cash for the benefit of the growers in each transaction. More fundamentally, the majority's discussion of PACA's purpose seems to conflate lenders-to-the-distributor with lenders-to-the-trustee. Lenders to the distributor cannot reach PACA assets in bankruptcy because TDI holds those assets in trust for the growers. *See Sunkist Growers*, 104 F.3d at 282. But when we deal with secured lenders *to the trust*, the loan advance and subsequent payments become trust property, and it is fully consistent with PACA's purpose to look at whether the trust got a fair (i.e., commercially reasonable) deal.

Once we discard the majority's theory of breach, its discussion of the test for a "true sale" becomes irrelevant. Maj. Op. at 26–27. In the trust context, the key question is not whether the trustee is engaged in a sale or loan, but whether the trustee breached its fiduciary duty in entering into the loan agreement (and complying with it according to its terms). The answer to that question turns primarily on the commercial reasonableness of the individual transaction and its terms.

IV

By enacting PACA, Congress provided significant protection to growers by ensuring that a distributor who buys their produce on credit owes the growers a fiduciary duty to manage the trust assets (the produce and its proceeds) for their benefit. Contrary to the majority's assertion, this protection does not entitle growers to disregard obligations undertaken by the trustee on their behalf. If the trustee borrows money for the benefit of the beneficiaries in a commercially reasonable transaction, the lender is entitled to be paid back from trust assets. Under trust principles and PACA, there is an exception to this rule only if the trustee breached its fiduciary duties when it entered into the loan

arrangement, and the lender was on notice of this breach. In this context, there is no need to distinguish between "true sales" and "loans." In other words, we had it right in *Boulder Fruit*: we look at the commercial reasonableness of the agreement to determine whether it was a breach of trust, regardless whether the agreement is a sale or a loan. Recourse provisions and other features that "transfer risk" may be relevant to this analysis. But unless the transaction is commercially unreasonable or otherwise a breach of the trustee's fiduciary duty, there is no basis under PACA or trust law for depriving the lender of its right to repayment under the loan agreement or, as in this case, requiring a lender that has loaned money to the trust and been repaid by the borrower to return the borrower's repayment.

The majority's approach is inconsistent with PACA, and that should be enough to reject it. "[W]e will not presume with [appellants] that any result consistent with their account of the statute's overarching goal must be the law but will presume more modestly instead 'that [the] legislature says . . . what it means and means . . . what it says.'" *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (third, fourth, and fifth alterations in original) (quoting *Dodd v. United States*, 545 U.S. 353, 357 (2005)).

But the majority's approach also makes no sense as a practical matter. Under the majority's decision, a transaction in which the trustee made a commercially reasonable sale of a $200 account receivable to AgriCap and received $150 in return *would not* constitute a dissipation of trust assets, and AgriCap could keep the $200 it collected on the account receivable from the retailer. But a transaction in which the trustee received a $200 loan from AgriCap (secured by a security interest in the same $200 account receivable) and agreed to pay back the loan when it collected the $200 from

the retailer, *would* constitute a dissipation of assets if the trustee paid back the loan.[20]  By imposing these drastically divergent outcomes based on the loan-sale distinction, the majority fails to heed its own advice that "courts must focus on the true substance of PACA-related transactions and not on artificial indicators or labels."  Maj. Op. at 25.

Moreover, the majority's approach will hurt PACA beneficiaries in the long run.  If lenders face the prospect that any repayments they receive will be a breach of trust and subject to disgorgement, they will either refuse to engage in factoring transactions or impose more severe terms to account for the heightened risk.[21]

---

[20] As explained above, *supra* p. 54, the distributor-trustees constantly generate new outstanding obligations to growers in the ordinary course of business, meaning that in practical terms, any repayment could be a breach under the majority's theory.

[21] "[I]n desperation," the majority attempts to distract attention from the necessary implications of its own logic by pointing to policy issues, passing statements in oral argument, and its reliance on the Fourth Circuit's similar errors.  Maj. Op. at 33 n.11.  Instead of reasoning and analysis, the majority offers only conclusory statements.  For instance, the majority states "nowhere do we suggest that trusts are free to disregard their obligations to lenders."  But this is contrary to the majority's own reasoning, that "whenever a loan is made, a PACA trustee must be careful to ensure all trust beneficiaries are paid before the lender collects."  Maj. Op. at 33.  Said otherwise, a trustee cannot repay the lender according to the terms of the loan.  Or at all—as explained above, *supra* p. 54, given the nature of a floating, non-segregated trust, some trust beneficiaries will be unpaid at any given time.

Similarly, the majority argues we should not consider the consequences of its theory of breach, because it remands to the district court for a determination of damages.  Maj. Op. at 33 n.11.  But it

I respectfully dissent.

---

requires no "interested speculation and conjecture" to conclude that, if the Factoring Agreement is deemed to be a loan, AgriCap would have to return all loan payments it received, up to the value of TDI's debts to Palmer. *See Nickey Gregory*, 597 F.3d at 607 n.2 ("As we have noted, because the accounts receivable and their proceeds were trust assets, the unpaid commodities sellers have a prior interest in them and can recover from AgriCap to the full satisfaction of their debts up to the limit of trust assets held while they remained unpaid.").